SOUTHERN RAILWAY COMPANY, PETITIONER, ET AL.,[1] *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 21481, 29951, 37887–37898.    Promulgated February 9, 1933.

---

[1] Proceedings of the following petitioners are consolidated herewith: Mobile & Ohio Railroad Company; New Orleans & Northeastern Railroad Company; Northern Alabama Railway Company; Danville & Western Railway Company; Blue Ridge Railway Company; Chattanooga Terminal Railway Company; Lenoir Car Works; Alabama Land & Development Company; New Orleans Terminal Company; Railway Fuel Company; and St. Johns River Terminal Company.

*L. E. Jeffries, Esq.*, and *John B. Hyde, Esq.*, for the petitioner.
*D. A. Taylor, Esq.*, and *J. T. Haslam, Esq.*, for the respondent.

OPINION.

TRAMMELL. The respondent has determined deficiencies in income taxes against the several petitioners for the years and in amounts as follows:

| Petitioner | Docket No. | Year | Deficiency |
|---|---|---|---|
| Southern Railway Company | 21481 | 1920 | $1,446,629.92 |
| | | 1921 | 245,466.40 |
| | 29951 | 1922 | 631,012.43 |
| | 37887 | 1923 | 114,994.26 |
| Mobile & Ohio Railroad Company | 37888 | 1923 | 27,149.99 |
| New Orleans & Northeastern Railroad Company | 37889 | 1923 | 63,409.30 |
| Northern Alabama Railway Company | 37890 | 1923 | 4,896.62 |
| Danville & Western Railway Company | 37891 | 1923 | 1,824.92 |
| Blue Ridge Railway Company | 37892 | 1923 | 278.20 |
| Chattanooga Terminal Railway Company | 37893 | 1923 | 34.34 |
| Lenoir Car Works | 37894 | 1923 | 5,614.66 |
| Alabama Land & Development Company | 37895 | 1923 | 3.32 |
| New Orleans Terminal Company | 37896 | 1923 | 45,860.34 |
| Railway Fuel Company | 37897 | 1923 | 3,070 08 |
| St. Johns River Terminal Company | 37898 | 1923 | 753.74 |

Nine of the fifteen assignments of error set forth in the petitions and five of the six issues raised by the respondent's affirmative defense have been disposed of by abandonment, confession, or stipulation. The proceedings were consolidated for hearing and decision.

The parties have filed a written stipulation, the first five paragraphs of which read as follows:

It is hereby stipulated and agreed by and between the petitioner and the respondent, through their respective counsel of record, that the following facts shall, upon the filing of this stipulation, be taken as true without further proof thereof, provided this stipulation is without prejudice to the right of either party herein to offer other and further evidence not inconsistent with the provisions of this stipulation.

1. The above appeals relate to the consolidated income of the Southern Railway Company and its affiliated corporations for the calendar years 1920 to 1923, inclusive. The following is a list of all the companies affiliated with the Southern Railway Company for said years, designated as those which were common carriers and those which were not common carriers during the years in question:

COMMON CARRIERS:
Southern Railway Company
Asheville & Craggy Mountain Railway Company
Asheville & Northern Railway Company
Asheville Southern Railway Company
Atlantic & Yadkin Railway Company
Blue Ridge Railway Company
Chattanooga Terminal Railway Company
Cumberland Railroad Company
Carolina & Tennessee Southern Railway Company
Cumberland Railway Company
Danville & Western Railway Company
Delta Southern Railway
Ensley Southern Railway Company
Georgia Midland Railway Company
Georgia Midland Terminal Company
Hartwell Railway Company
Johnson City Southern Railway Company
Memphis Chattanooga Railway
Memphis & Charleston Railway Company
Middlesboro Mineral Railway Company
Mobile & Ohio Railroad Company
Warrior Southern Railway Company
New Orleans Terminal Company
North & South Carolina Railroad Company
Southern Railway Company in Mississippi (Name changed to Columbus & Greenville Railroad Company) to October 22, 1920 only.
New Orleans & Northeastern Railroad Company
Northern Alabama Railway Company
Southern Railway-Carolina Division
St. Johns River Terminal Company
Southern Railway Company of Illinois

Southern Railway Company of Indiana
Southern Railway Company of Kentucky
Sievern & Knoxville Railroad Company
Tallulah Falls Railway Company
Tennessee & Carolina Southern Railway Company
Virginia & Southwestern Railway Company

NOT COMMON CARRIERS:

Georgia Industrial Realty Company
Lenoir Car Works
Alabama Land Development Company
Interstate Car Works
Mobile Docks Company
National Investment Company
Railway Fuel Company

That the Southern Railway Company and its above mentioned affiliated common carrier companies were, at all times herein mentioned, engaged in interstate commerce, subject to the Interstate Commerce Act, and required to and did keep their books of account upon the accrual basis and in accordance with the rules and regulations prescribed by the classification of accounts of the Interstate Commerce Commission. Copies of three standard forms of said classification called " Classification of Income, Profit, and Loss and General Balance Sheet Accounts for Steam Roads, Effective July 1, 1914 ", " Classification of Operating Revenues and Operating Expenses of Steam Roads, Effective July 1, 1914 ", and " Classification of Investment in Road and Equipment, Effective July 1, 1914 ", are herewith attached and made parts hereof, marked Exhibits 1, 1–A and 1–B, respectively.

The above mentioned companies designated " Not Common Carriers " kept their books of account upon the accrual basis during the years herein involved.

2. The word " petitioner " as used in this stipulation, unless specifically qualified, refers to the affiliated group.

3. There is attached hereto and made a part hereof, marked Exhibit 2, a classified tabulation of issues involved in the above mentioned appeals, setting forth in parallel columns a classified list of the issues involved; the year or years involved; amounts of adjustments to income claimed in petitions, or in amendments thereto, and in affirmative pleas of respondent; amounts of adjustments to income so claimed but herein conceded by the petitioner; amounts of adjustments to income so claimed and herein conceded by the respondent; and amounts of adjustments to income so claimed and herein submitted to the Board.

There is attached hereto and made a part hereof, marked Exhibit 3, sheets listing, opposite numbers, the errors assigned in the petitions and in the various amendments to the petitions, designating in which the error is assigned; number thereof; the amount, or amounts, involved as named in said pleadings; and affirmative issues raised by the respondent.

The headings of the issues hereinafter set forth as conceded are identified with the assignments of error, listed on said Exhibit 3, by means of the numbers contained in the first column of said Exhibit 3.

4. The petitioner withdraws the following assignments of error and concedes that the respondent's adjustments with respect thereto, as set forth in the sixty-day letter and/or sixty-day letters, were correct:

Transportation for Investment-Credit (Line 25, Exhibit 3, Sheet C)

Profit on Road Property Retired (Line 5, Exhibit 3, Sheet A)

Rental Interest on Allocated Equipment (Line 6, Exhibit 3, Sheet A)

Allocated Equipment, Interest (Line 28, Exhibit 3, Sheet C)

Interest other than Rental Interest (Line 10, Exhibit 3, Sheet A), (Line 20, Exhibit 3, Sheet B), (Line 37, Exhibit 3, Sheet C)

Interest on Additions and Betterments Adjustment (Line 30, Exhibit 3, Sheet C)

Interest During Construction, Federal Control (Line 21, Exhibit 3, Sheet B), (Line 38, Exhibit 3, Sheet C), (Line 47, Exhibit 3, Sheet D).

5. The respondent concedes that in his determination of the petitioner's net taxable income for the years in question, he committed errors as alleged by the petitioner in the following assignments of error:

Depreciation prior to July 1, 1907 (Line 27, Exhibit 3, Sheet C)

Interest on Columbus & Greenville Railroad Company's Bonds (Line 26, Exhibit 3, Sheet C), (Line 41, Exhibit 3, Sheet D)

Loss on Lawrenceville Branch Railroad Company's Notes (Line 16, Exhibit 3, Sheet B)

New Orleans Terminal Loss (Line 35, Exhibit 3, Sheet C).

Exhibits Nos. 1 to 3, inclusive, of the stipulation are incorporated herein by reference. The matters so disposed of by the stipulation will be given effect in the recomputation under Rule 50.

## Donations.

Paragraph 6 of the stipulation is as follows:

6. DONATIONS: In determining the petitioner's taxable income for the years in question the respondent included therein as income the following amounts designated Donations:

| | |
|---|---|
| 1920 | $46,073.32 |
| 1921 | 62,238.64 |
| 1922 | 90,195.25 |
| 1923 | 34,427.30 |

The respondent concedes that in so doing he erred in so including the following amounts thereof:

| | |
|---|---|
| 1920 | $30,184.76 |
| 1921 | 54,005.32 |
| 1922 | 82,866.44 |
| 1923 | 25,834.59 |

The correctness of the action of the respondent in including the following remaining portions of said amounts, designated Donations, in taxable income remains in issue:

| | |
|---|---|
| 1920 | $15,888.56 |
| 1921 | 8,233.32 |
| 1922 | 7,328.81 |
| 1923 | 8,592.71 |

Pursuant to and in accordance with the provisions of certain contracts entered into between the petitioner and individuals and/or companies, a representative copy of which is attached hereto and made a part hereof, marked Exhibit 4, said individuals and companies made deposits of cash with the petitioner in amounts equal to the estimated cost of industrial tracks to be con-

structed. The amounts stated above remaining in issue constitute the aggregate of the unrefunded and unrefundable balances of cash so deposited by said individuals or companies. Said unrefundable balances were credited by the petitioner in the years above mentioned to Account No. 606, Donations, referred to in the Interstate Commerce Commission's Classification of Accounts, Exhibit 1, subsequent to the fulfillment of the conditions contained in said contracts.

The representative copy of the contracts, Exhibit 4 of the stipulation, under which the amounts in question were received by the petitioner, provides substantially as follows: That upon receipt from the applicant of a specified sum, representing the estimated cost of construction, the petitioner will lay and construct a track according to certain specifications; that upon completion of the track, if the actual cost is less than the estimated cost, the petitioner will repay to the applicant the difference; that the petitioner will further refund to the applicant the actual cost of nonperishable metal, not to exceed a specified amount, used in the construction of the track, by making annual payments to the applicant in amounts equal to 5 per cent of the revenue accruing to the petitioner out of traffic shipped from and to said track, but in no case shall said payments extend over a period of more than four and one-half years, commencing immediately upon completion of said track; that during the life of the agreement, the petitioner will operate and maintain the track, except as otherwise provided; that upon the completion of the track, if the actual cost is more than the estimated cost, the applicant will pay the petitioner the difference; that the applicant, at its own cost and expense, will do all the grading required by the petitioner in laying the track and also pay for the future maintenance of the trestles; that the applicant will, at its own cost and expense, provide a tender for and maintain such switch-lamp as may be established by the petitioner for the operation of its trains during the agreement; that the applicant will ship and cause to be shipped over the lines of the petitioner and its connections all freights used or produced in or about its business, provided, however, that rates are afforded the applicant by the petitioner which are not in excess of those of competing carriers for similar services performed under substantially similar circumstances and conditions; that the applicant will indemnify the petitioner against all loss and damage resulting from the petitioner's negligence on or about the track or the right of way therefor, and against all loss and damage to the applicant's property, or the property of third persons upon the applicant's premises, caused by fire, set out by the petitioner, whether the same results from the negligence of the petitioner or otherwise; that title to and ownership of the track shall be vested in the petitioner, who

shall have entire control thereof and the right to use the same for the business of third persons, provided, however, that such use of the track for the benefit of third persons shall not unreasonably interfere with the business of the applicant; and that the agreement may be terminated by either party, upon 30 days written notice, in which event, the petitioner may discontinue the operation of the track and remove its property, including all fixtures, therefrom, and from the right of way appurtenant thereto.

The amount in controversy for each taxable year was received by the petitioner, under the above described contracts, four and one-half years previously.

The individuals and companies that made payments to the petitioner, under the above described contracts, paid the same freight rates on shipments over the petitioner's lines as did other shippers who had no such contractual relation with the petitioner.

Account 606, Donations, is described in the Interstate Commerce Commission's Classification of Income, Profit and Loss, and General Balance Sheet Accounts, as follows:

This account shall include amounts, creditable to surplus, of cash or its equivalent in estimated money value at the time of acquisition of lands or other property donated by individuals or companies for the construction or acquisition of property. It shall also include donations made by individuals and companies in connection with the construction of new lines for the purpose of compensating the carrier for loss anticipated during the early period of operation.

Any advances made by individuals or companies with absolute or conditional provision for partial or complete reimbursement shall not be considered a donation prior to the fulfillment of all conditions, and then only to the extent to which the liability for reimbursement is nullified or negatived. Prior to such determination the amounts received shall be credited in balance-sheet account No. 778, "Other unadjusted credits."

The Interstate Commerce Commission's Classification of Investment in Road and Equipment of Steam Roads provides, with respect to items to be charged to accounts for investment in road and equipment, as follows:

2. *Items to be charged.*—To these accounts shall be charged the cost of original road, original equipment, road extensions, additions, and betterments; also the estimated values at time of acquisition of right of way and other road and equipment property donated to the carrier * * *

*Costs* shall be actual money costs to the carrier. Where a portion of the funds expended by the carrier has been obtained through donations by States, municipalities, individuals, or others, no deductions on account of such donations shall be made in stating the costs * * *.

The petitioner's comptroller testified that refunds were made to applicants at the rate of $2 per loaded freight car shipped from and to the tracks; and a finding to that effect is requested by both parties. This does not accord with the refunding provisions of

the typical contract in evidence as Exhibit 4 of the stipulation; but, since the fact of refunding, and not the method thereof, is the important thing, to note the apparent conflict of evidence in that respect will suffice for the purposes of this opinion. The result would not be different whichever is correct.

Contributions received by a public utility corporation in aid of construction, from persons who are to be benefited by the facilities, are not taxable income. *Texas & Pacific Ry. Co. v. United States*, 52 Fed. (2d) 1040; *Liberty Light & Power Co.*, 4 B. T. A. 155; *Great Northern Ry. Co.*, 8 B. T. A. 225; *Texas & Pacific Ry. Co.*, 9 B. T. A. 365; *Atlantic Coast Line Ry. Co.*, 9 B. T. A. 1193; *Kansas City Southern Ry. Co.*, 16 B. T. A. 665; *Midland Valley R. R. Co.*, 19 B. T. A. 423; *Kansas City Southern Ry. Co.*, 22 B. T. A. 949; *Union Pacific R. R. Co.*, 26 B. T. A. 1126. The respondent contends, however, that the rule has no application here, because the amounts in question are not contributions, but are the unrefundable portions of guaranties posted by applicants to assure their performance of the contracts. This is the same contention as the respondent pressed in *Union Pacific R. R. Co.*, *supra*, upon facts substantially similar in all respects with those in the case at bar. Concerning it, we said:

The respondent argues that under the contracts the amounts deposited by the industries were not contributions to capital but were guaranties or earnest money to insure the performance of that part of the contracts which provided for the shipment of revenue freight. We do not understand the contracts to obligate the industries to ship any freight over the facilities for which they paid by making deposits with the carrier. The contracts merely provide that if and when shipments were made by the depositor the amounts deposited would be refunded on a car load basis. We think it safe to say that in all cases where contributions are made to common carriers or public utilities for the construction of additional facilities it is the intention of all parties that the facilities will be used by the contributors. Whether the donations were income when placed in the " 707 " account is not before us to decide. When the contract period for refund expired and the donations became the absolute property of the carrier, we are clearly of the opinion that they assumed the same character as donations placed in the " 606 " account in the first instance and so fall within the *Great Northern* decision, *supra*.

The contracts under which the payments were made are substantially the same in both cases; and our reasoning in the earlier case applies with equal force here. The decision on this issue must favor the petitioner.

### *Guaranty.*

Paragraph 16 of the stipulation is as follows:

16. GUARANTY INCOME: It is agreed that the sum of $2,585,507.68 is made up of the amounts allowed to the companies involved herein under the provisions

of Section 209 of the Act of February 28, 1920, known as Transportation Act, 1920. by reason of their acceptance of the provisions of that act. The guaranty period for which said amount was paid extended from March 1, 1920, to August 31, 1920, both inclusive. A list of said companies, the amounts allowed, and the year of allowance were as follows:

TABULATION OF GUARANTIES

| Name of Company | Amounts Paid In— | | | | Total |
|---|---|---|---|---|---|
| | 1920 | 1921 | 1922 | 1923 | |
| Ashe. & Crg. Mtn. Co | | | $1,224.19 | | $1,224.19 |
| Atl. & Yad. Ry. Co | | | 64,751.33 | | 64,751.33 |
| Blue R. Ry. Co | | | 27,991.20 | | 27,991.20 |
| C. & T. S. Ry. Co | | | 4,434.82 | | 4,434.82 |
| Cumberland R. R. Co | | | 15,827.79 | | 15,827.79 |
| Delta Sou. Ry | | | 72,392.58 | | 72,392.58 |
| Dan. & W. Ry. Co | | | 37,548.74 | | 37,548.74 |
| Hartwell Ry. Co | | | 6,739.89 | | 6,739.89 |
| M. & O. R. R. Co | $950,000.00 | $375,000.00 | 605,735.85 | | 1,930,735.85 |
| Nor. Ala. Ry. Co | | 69,711.61 | | | 69,711.61 |
| Tall. Falls Ry. Co | | | 40,979.24 | | 40,979.24 |
| C. & G. R. R. Co. (formerly Sou. Ry. Co. in Miss.) | | | | $313,170.44 | 313,170.44 |
| TOTALS | 950,000.00 | 444,711.61 | 877,625.63 | 313,170.44 | 2,585,507.68 |

The above amount of $2.585,507.68 was included in taxable income in petitioner's return for 1920, and the tax due thereon was duly paid.

The petitioner contends that payments received from the United States under the guaranty provisions of section 209 of the Transportation Act, 1920, are nontaxable income, and the respondent erred in failing or refusing to exclude the amount in question from the reported net income for 1920. It concedes that this contention is contrary to the prior decisions of this Board in the matter, but does not concede the correctness of those decisions. The matter has now definitely been settled by the decision of the United States Supreme Court, in *Texas & Pacific Ry. Co.* v. *United States*, 286 U. S. 285, affirming the Court of Claims, the court holding that: " In a proper sense these payments constituted income to the carrier not exempt from taxation under the Sixteenth Amendment or the Revenue Act of 1918."

Accordingly, the determination of the respondent on this issue is approved.

*Interest during construction.*

Paragraph 12 of the stipulation is as follows:

12. INTEREST DURING CONSTRUCTION: During the years 1905, 1906, and 1907 the Southern Railway Company advanced to the Delta Southern Railway, a company affiliated with the Southern Railway Company, funds for building a line of railroad. The interest which accrued on such advances during said years amounted to $38,571.76. The amounts advanced and said interest were charged by the Delta Southern Railway to Account No. 701, " Investment in

Road and Equipment" as Interest During Construction. Said interest thus capitalized prior to 1909 was, from the date so capitalized, included in the cost or book value of the capital investment of said Delta Southern Railway. All of the railroad property of the Delta Southern Railway so built was retired in 1922. In connection with said retirement, the Delta Southern Railway, as a member of the affiliated group (petitioner), claimed a loss of $1,222,-929.51, which claimed loss included the amount of said interest during construction, $38,571.76. The respondent, in determining the consolidated taxable income of the petitioner for the year 1922, disallowed that portion of the claimed loss represented by the said interest during construction, namely, $38,571.76. Neither the Delta Southern Railway nor any other of the affiliated corporations has ever claimed, nor has the respondent allowed, as a deduction from gross income in any taxable year the $38,571.76, interest during construction, except as claimed herein for the year 1922.

The Interstate Commerce Commission's Classification of Investment in Road and Equipment prescribes with reference to Account No. 701, " Investment in Road and Equipment," as follows:

This account shall also include reasonable charges for interest, during the construction period before the property becomes available for service, on the carrier's own funds expended for construction purposes.

The petitioner contends that interest on indebtedness incurred for new construction, which accrued prior to March 1, 1913, and was included in capital costs by the compulsory requirement of the Interstate Commerce Commission, is an integral part of capital, and may not be constitutionally excluded from the basis for determining the loss sustained by the Delta Southern Railway Company, upon the retirement of its railroad property in 1922.

The question of including interest and other carrying charges as a part of the cost basis for determining gain or loss upon the disposition of the property for which such charges were incurred, has been considered on several occasions by the Board and the courts, and in each instance, the decision has been adverse to this petitioner's contention. *Columbia Theatre Co.*, 3 B.T.A. 622; *Spring Valley Water Co.*, 5 B.T.A. 660; *Eastern Rolling Mill Co.*, 5 B.T.A. 663; *Arthur C. Fraser*, 6 B.T.A. 346; affd., *Fraser* v. *Commissioner*, 25 Fed. (2d) 653; *Oswego & Syracuse R. R. Co.*, 9 B.T.A. 904; affd., *Oswego & S. R. Co.* v. *Commissioner*, 29 Fed. (2d) 487; certiorari denied, 279 U. S. 842; *Central Real Estate Co.*, 17 B.T.A. 776; affd., 47 Fed. (2d) 1036; *Westerfield* v. *Rafferty*, 4 Fed. (2d) 590. But the petitioner contends that these decisions are not controlling, because the interest involved in this case was required to be added to capital cost by the classification of accounts of the Interstate Commerce Commission as a basis for fixing interstate rates. This contention has been answered in *Kansas City Southern Ry. Co.* v. *Commissioner*, 52 Fed. (2d) 372, as follows:

Systems of accounting for railroads under the control of the Commission cannot interfere with the government's system of taxation. The Commission has no power to direct how the Revenue Laws of the United States shall be interpreted or by its orders provide standards to govern the taxing authorities.

The constitutional implications have been considered also, in *Fraser* v. *Commissioner*, *supra*, and *Westerfield* v. *Rafferty*, *supra*, and no constitutional objection was found to the exclusion of such charges from the base.

Accordingly, we approve the respondent's determination on this issue.

### Bond Discount.

Paragraph 8 of the stipulation is as follows:

8. BOND DISCOUNT: In amendments to the petition, petitioner has assigned errors as to each of the years 1920 to 1923, inclusive, to the effect that the respondent erred in failing to allow petitioner to deduct an annual proportion of bond discount each year, aggregating $187,530.38.

Petitioner withdraws its claims with respect thereto in the following amounts for the respective years:

| | |
|---|---|
| 1920 | $8,140.93 |
| 1921 | 8,625.79 |
| 1922 | 38,912.29 |
| 1923 | 343.17 |

The respondent concedes that he erred in failing to allow petitioner to deduct the following respective amounts in the following respective years:

| | |
|---|---|
| 1920 | $147,833.84 |
| 1921 | 147,348.98 |
| 1922 | 117,062.48 |
| 1923 | 155,631.60 |

The correctness of the action of the respondent in disallowing the following remaining portions of said amounts, designated Bond Discount, as deductions from taxable income, remains in issue:

| | |
|---|---|
| 1920 | $31,555.61 |
| 1921 | 31,555.61 |
| 1922 | 31,555.61 |
| 1923 | 31,555.61 |

Of the above amount of $31,555.61 remaining in issue as to each year, $22,617.06 is claimed by petitioner as discount on Mobile & Ohio General 4% Bonds as sustained by Mobile & Ohio Railroad Company, and $8,938.55 is claimed as discount in each year on St. Louis and Cairo Railroad Company 4% Bonds; as to the first item, however, petitioner claiming in the alternative in the amended petition that if such discount be not an allowable deduction as respects the Mobile & Ohio Railroad Company, then Southern Railway Company, in the alternative, is entitled to a discount in lieu thereof of $11,191.07 in each of said four years.

The facts regarding these respective items are as follows:

On or about May 15, 1888, Mobile & Ohio Railroad Company, pursuant to General Mortgage of that date, issued and sold its General Mortgage 4% Bonds

of the par value of $9,472,000 for the sum of $8,190,163.80, sustaining a discount of $1,281,836.20. These bonds will become due on September 1, 1938, running for a period of approximately 50 years.

Pursuant to public offer of Southern Railway Company, dated January 31, 1901, a true copy of which public offer is hereto attached and made a part hereof, marked Exhibit 5, Southern Railway Company exchanged for the above Mobile & Ohio General 4% Bonds in the amount of the par value of $8,356,000, and of the market value when exchanged of $7,938,200, its Southern Railway Company-Mobile & Ohio Collateral 4% Gold Bonds, the same being dated March 1, 1901, and exchanged and issued May 1, 1901, which will become due on the same date as the due date of the Mobile & Ohio Railroad Company General Mortgage 4% Bonds, September 1, 1938.

On the basis of amortizing the discount sustained by the Mobile & Ohio on its General Mortgage 4% Bonds, over a period of 50 years, there is annually allocable to each of the calendar years 1920, 1921, 1922, and 1923, discount of $25,637.72 as to the entire issue of $9,472,000, while the annual proportion of the discount allocable to that portion of the Mobile & Ohio General 4's for which Southern Railway Company exchanged its Mobile & Ohio Collateral 4% Gold Bonds (of the par value aforesaid of $8,356,000) is the sum of $22,617.06.

The Mobile & Ohio General 4's of the par value of $8,356,000 exchanged by the holders thereof for Southern Railway Company-Mobile & Ohio Collateral 4% Gold Bonds are pledged by Southern Railway Company as the sole collateral security under its Mobile & Ohio Collateral Trust Indenture, dated March 1, 1901, a copy of which Indenture is attached hereto and made a part hereof, marked Exhibit 6.

In exchanging its Mobile & Ohio Collateral 4% Gold Bonds for the $8,356,000 Mobile & Ohio General 4's, Southern Railway Company was enabled to obtain the voting control of the Mobile & Ohio Railroad Company.

The Board's decision is invoked under the above facts, on the question of whether, in the alternative, the deduction of $22,617.06 or of $11,191.07, is allowable, or whether or not petitioner is entitled to either of them.

The second item in controversy is the item of $8,938.55 claimed as a deduction for discount by Mobile & Ohio Railroad Company in each of the years 1920, 1921, 1922, and 1923 as discount on St. Louis and Cairo Railroad Company First Mortgage 4% Gold Bonds. The facts regarding the transaction are as follows:

Pursuant to mortgage dated April 1, 1886, St. Louis and Cairo Railroad Company, an Illinois corporation, issued its 4% First Mortgage 50-year Bonds, maturing January 1, 1931, of the par value of $4,000,000, exchanging $2,600,000 thereof at par for an equal par value of a prior mortgage thereby refunded and selling the remaining par value of $1,400,000 for $1,000,000, the discount on such sale amounting to $400,000, the annual unamortized discount allocable to each of the years 1920, 1921, 1922, and 1923 being the sum of $8,938.55.

Prior to the issue and sale of said bonds as of April 1, 1886, St. Louis and Cairo Railroad Company, on February 1, 1886, leased its entire line of railroad to Mobile & Ohio Railroad Company for a term of 45 years, to expire January 1, 1931, upon certain rentals therein stipulated to be paid. A true copy of said lease is hereto attached and made a part hereof, marked Exhibit 7.

The above discount sustained by the St. Louis and Cairo Railroad Company was charged to Capital, or Property Investment account, in 1886, and no part thereof was amortized on its books.

, By the year 1901, Mobile & Ohio Railroad Company had acquired all but 17 shares out of a total of 65,000 shares of the capital stock of the St. Louis and Cairo Railroad Company, and, having acquired the remaining shares subsequently thereto, caused the conveyance to be made to it of the entire property of the St. Louis and Cairo, by deed dated July 28, 1913 (a true copy of which is hereto attached and made a part hereof, marked Exhibit 8), said Mobile & Ohio taking said property subject to the lien of the mortgage securing said $4,000,000 bonds, the payment of the principal of which Mobile & Ohio expressly assumed, in addition to its continuing guaranty of the interest thereon. The property so acquired was recorded on the books of the Mobile & Ohio Railroad Company at a value which included the cost to it of the capital stock and the par value of the $4,000,000 bonds assumed. No part of said discount has been amortized on the books of the Mobile & Ohio Railroad Company.

Exhibits 5 to 8, inclusive, of the stipulation are incorporated herein by reference.

In *New Orleans, Texas & Mexico Ry. Co.*, 6 B. T. A. 436, and *Gulf, Mobile & Northern R. R. Co.*, 22 B. T. A. 233, we held that a corporate taxpayer which issued its bonds for a price less than their aggregate face value may not deduct a pro rata part of the discount in computing consolidated net income for a year in which such bonds were owned by an affiliated company. Those cases would seem to dispose of so much of the issue as concerns the discount on the Mobile & Ohio General 4 per cent bonds. The petitioner, however, contends that they are not controlling here, because " the ' exchange ', both from the standpoint of the holder of Mobile & Ohio General 4's and from the standpoint of the Southern Railway Company, was not a ' sale ' or ' purchase ', but  *  *  *  in substance was merely the endorsement of the Southern's guarantee on the Mobile & Ohio General bonds, which, from a law standpoint, would have been equally effective if contained in a physical endorsement on the original bond." The contention is wholly without foundation. The substance of the transaction must be determined from what actually took place, and not from what may appear to the petitioner to have been the economic effect. The Southern Railway's offer, Exhibit 5 of the stipulation, was to exchange for Mobile & Ohio General 4's its own collateral trust gold bonds secured by a pledge of all said Mobile & Ohio General 4's which it acquired or owned. The collateral trust indenture, Exhibit 6 of the stipulation, recites that the Southern Railway "has acquired or is about to acquire certain general mortgage fifty-year four per cent. bonds of the Mobile and Ohio Railroad Company "; that " for the purpose of making payment for such bonds so acquired and to be acquired by it, the Railway Company desires to make and issue and to use its Collateral Trust Four Per Cent. Gold bonds "; and that " in order to secure the payment of the principal and the interest of all such Collateral Trust Four Per Cent. Gold

Bonds * * * and in consideration of the premises and of the purchase and acceptance of such bonds by the holders thereof * * * the Railway Company * * * does assign and transfer unto the Trustee * * * $7,530,000 par value of the General Mortgage Four Per Cent. bonds of the Mobile and Ohio Railroad Company." The form of bond contained in the Collateral Trust Indenture recites that "this bond is one of a series * * * issued and to be issued, * * * secured by a Collateral Indenture, * * * pledging all of the General Mortgage Four Per Cent. Bonds of the Mobile and Ohio Railroad Company, now owned or hereafter acquired by the Railway Company"; and the resolutions of the stockholders of the Southern Railway Company, contained in the same instrument, recites that the said stockholders "hereby do approve, ratify and confirm the action of the Board of Directors * * * in entering into arrangements for purchasing, and in purchasing, the whole or part of the General Mortgage Bonds * * * of the Mobile and Ohio Railroad Company, * * * and in consummating and in completing the purchase of such bonds; * * * and hereby specifically do authorize, ratify and confirm: * * * The execution and delivery of the Mobile and Ohio Collateral Trust Indenture of the Southern Railway Company, * * * pledging all of the General Mortgage Bonds of the Mobile and Ohio Railroad Company acquired or to be acquired * * *, as security for the payment of the said Mobile and Ohio Collateral 4% Gold Bonds." There is not even a suggestion of guarantee by the Southern Railway of the Mobile & Ohio's General 4's; as, indeed, no such guaranty was deemed necessary, since the Southern Railway became the absolute owner of such bonds, subject only to the collateral trust indenture. The rule announced in the cited cases is applicable here; and the respondent's action in disallowing so much of the bond discount as is related to the Mobile & Ohio General 4% Bonds is approved.

As an alternative issue, the petitioner claims an annual deduction of $11,191.07 for amortization of discount on its collateral trust bonds issued in exchange for the Mobile & Ohio's General 4's. The propriety and not the amount of the deduction is the only matter at issue. The parties have stipulated that the Mobile & Ohio's General 4's acquired by the petitioner were of the par value of $8,356,000, and had a market value, as of the date of acquisition, of $7,938,200. For those securities the petitioner agreed to pay not the market value, but the par value thereof, $8,356,000, giving as evidence of its indebtedness for that sum its own interest-bearing collateral trust gold bonds. The petitioner says that the difference between the market value of the acquired securities and the amount

which it agreed to pay therefor is discount. The stipulated facts present an entirely different situation from the case in which a corporate taxpayer issues its bonds for cash at less than par value. In such a case, the corporation agrees upon the maturity date of the bonds to pay back a greater sum than that it borrowed; and the difference being added compensation for the use of another's money for a term, it has been recognized as an ordinary and necessary expense of the whole term and its amortization given deductibility. (See *New York, Chicago & St. Louis R. R. Co.*, 23 B. T. A. 177.) In the instant case, the petitioner has agreed to pay on a date and in an amount certain for the acquired securities. It must have known at the time of the transaction that it was agreeing to pay more than the then value of the property; but the occasion for the agreement is not evident. Its promise to pay bore interest, and for all that appears the interest was ample compensation for the privilege of deferred payment. The promise to pay a greater sum than the value of the property does not establish *ipso facto* the presence of discount in the transaction. The holders of the Mobile & Ohio's General 4's, having voting control of the Mobile & Ohio, may have driven a hard bargain in the petitioner's attempt to secure that control. In that situation the doctrine of nondeductibility of cost of property until its realization through sale or other disposition would deny the claimed deduction. We see nothing in the stipulated facts to indicate discount. Decision on the alternative issue must be for the respondent.

The issue raises the further question of the right of the Mobile & Ohio to deduct annually an aliquot part of the discount at which the St. Louis & Cairo Railroad Company issued its 4 per cent first mortgage fifty-year bonds in 1886. The propriety and not the amount of the deduction is the only matter at issue. Payment of the bonds was assumed by the Mobile & Ohio when it took over the properties of the St. Louis & Cairo in 1913. The respondent says that the deduction for amortization of the discount is available only to the issuer and not to the obligor who later assumes payment of the bonds. The petitioner, relying upon the decision of the Circuit Court of Appeals for the Fourth Circuit in *Western Maryland Ry. Co.* v. *Commissioner*, 33 Fed. (2d) 695, reversing the decision of this Board in *Western Maryland Ry. Co.*, 12 B. T. A. 889, contends that the Mobile & Ohio is entitled to the deduction. The respondent's contention here accords with the decision we reached in *Western Maryland Ry. Co.*, *supra*. Following the reversal of that decision by the Circuit Court, we had occasion to consider the question again in *Missouri Pacific R. R. Co.*, 22 B. T. A. 267, in which we stated:

\* \* \* Having in mind that appeals from our decisions lie to eleven Courts of Appeal and that one of the judges of the Court dissented in *Western Maryland Railway Co.* v. *Commissioner, supra,* and having also in mind that the grounds advanced in the prevailing opinion in that case are substantially the same as were rejected by the Supreme Court in *Marr* v. *United States, supra,* we respectfully adhere to the decision reached by us in *Western Maryland Railway Co., supra.* The action of the Commissioner in refusing to allow any deduction for amortization of discount upon bonds issued by the preceding owner of the property now owned by petitioner is approved.

The matter quoted above represents our present views on the question, and, accordingly, the respondent's action in disallowing so much of the bond discount as is related to the 4 per cent first mortgage fifty-year bonds of the St. Louis & Cairo is approved.

### Federal Control Loss.

In its brief the petitioner requests the following findings of fact on this issue:

In an amendment to the original petition in Docket 21481, filed on May 7, 1931, petitioner assigned as error the failure of the respondent to allow a deductible loss in the year 1920, or, in the alternative, in the year 1921, in the amount of $30,385,104.92, claiming to have sustained such loss in the settlements of its claims with the Director General.

Petitioner introduced no evidence on this issue at the hearing. Petitioner did not sustain such deductible loss.

This we accept as an abandonment by the petitioner of the assignment of error; and, accordingly, the respondent is sustained on this issue.

### Premium on Bonds.

Paragraph 9 of the stipulation is as follows:

The petitioner, prior to March 1, 1913, sold its First Consolidated Mortgage Gold Bonds from which it realized premiums in the total amount of $2,628,059.20. That if said premiums are amortized over the life of said bonds $29,626.60 thereof was allocable to each of the years 1920 to 1923, inclusive.

During the years in question and for years prior thereto during all of which years said bonds were outstanding, the petitioner paid to the holders of said bonds the interest provided therein and for the years in question deducted from income the annual interest paid on account of said bonds, which interest exceeded the annual portion of the premiums when amortized over the life of said bonds as above stated. In the determination of taxable net income of the petitioner as set forth in the deficiency letters from which these appeals are taken, said interest deductions have been allowed by the Commissioner of Internal Revenue without reducing said interest deductions by the amount of the annual amortized portion of said premiums and without including in petitioner's taxable income any portion of said premiums.

This is the one issue raised by the respondent's affirmative defense that is not settled by stipulation. In his brief, the respondent concedes that in view of the decision of the United States Supreme Court in *Old Colony R. R. Co.* v. *Commissioner*, 284 U. S. 552, our decision on this issue should favor the petitioner. We agree with that concession.

### *Issues Settled by Stipulation.*

The parties have further stipulated as follows:

7. Loss on Tennessee Central Railroad Company's Bonds: In determining petitioner's taxable income for the year 1921, the Commissioner of Internal Revenue disallowed a loss to the extent of $1,331,581.31 claimed to have been sustained by the petitioner for the year 1921 on its investment in bonds of the Tennessee Central Railroad Company. The respondent concedes that he erred in disallowing $535,200 of said amount disallowed, and the petitioner concedes that the respondent correctly disallowed the balance thereof, or $796,381.31.

10. South Carolina Interest and Taxes: The petitioner withdraws, of its original assignments of error with respect to this issue, the following amounts:

| | |
|---|---|
| 1921 | $3,552.67 |
| 1922 | 8,282.56 |
| 1923 | 46,172.19 |

The respondent concedes that the petitioner is entitled to deduct from gross income the following amounts with respect to this issue:

| | |
|---|---|
| 1921 | $24,291.54 |
| 1922 | 96,950.16 |
| 1923 | 30,734.61 |

11. New Orleans Terminal Company Loss—Wexler Suit: In determining the petitioner's taxable income for the year 1923, respondent included therein as income the amount of $30,809.34, designated "Settlement of Suit—Solomon Wexler."

Petitioner withdraws its assignment of error with reference to $7,800 of the above amount, and respondent concedes that he erred in including in income the balance there of $23,009.34.

23. (A) Depreciation on Leased Equipment: In determining the consolidated taxable net income of the petitioner for the years herein involved, the respondent has allowed as deductions the following amounts representing depreciation on equipment used by the petitioner under lease:

| | |
|---|---|
| 1920 | $2,310.52 |
| 1921 | 2,735.90 |
| 1922 | 2,483.43 |
| 1923 | 2,154.37 |

The petitioner concedes that the respondent erred in the allowance of the above mentioned deductions and that the petitioner's taxable income for said years may be increased in said respective amounts.

(B) Loss in Connection with Retirement of Leased Equipment: In determining the consolidated taxable net income of the petitioner for the years 1920, 1922, and 1923, the respondent has allowed as deductions from income the following amounts, representing losses charged off by the petitioner in

connection with the retirement of equipment used by the petitioner under lease:

| | |
|---|---|
| 1920 | $1,015.58 |
| 1922 | 1,227.06 |
| 1923 | 3,487.19 |

The petitioner concedes that the respondent erred in the allowance of the above mentioned deductions, and that the petitioner's taxable income for said years may be increased by said respective amounts.

The aggregate of the sums conceded by the petitioner, described in this paragraph of the Stipulation, is:

| | |
|---|---|
| 1920 | $3,326.10 |
| 1921 | 2,735.90 |
| 1922 | 3,710.49 |
| 1923 | 5,641.56 |

24. DEPRECIATION AND LOSS ON RETIREMENT OF EQUIPMENT ACQUIRED THROUGH INTERCOMPANY PURCHASE—LENOIR CAR WORKS: In determining the consolidated net income of the petitioner for the years herein involved, the respondent allowed as a deduction from income for each of the said years depreciation on equipment acquired by the Southern Railway Company from the Lenoir Car Works, one of its subsidiaries. The cost of said equipment included profit paid to the Lenoir Car Works. The Petitioner concedes that the respondent erred in allowing so much of such depreciation as was based upon the said profit to the Lenoir Car Works, amounting to the following:

| | |
|---|---|
| 1920 | $743.65 |
| 1921 | 4,033.73 |
| 1922 | 4,411.04 |
| 1923 | 4,387.14 |

In determining the consolidated net income of the petitioner, the respondent allowed as deductions from income losses based upon the cost to the said Southern Railway Company of so much of the above-mentioned equipment as was retired in the years 1922 and 1923. The petitioner concedes that the respondent erred in allowing such deductions in the following amounts, representing the said profit on said equipment so retired:

| | |
|---|---|
| 1922 | $223.41 |
| 1923 | 2,121.38 |

25. AMORTIZATION OF IMPROVEMENTS TO LEASED PROPERTY—ATLANTIC & DANVILLE: In determining the consolidated taxable net income of the petitioner for the years herein involved, the respondent allowed as deductions from income the following amounts, representing the annual amortized portion of the cost of improvements to property operated by the Southern Railway Company under lease from the Atlantic & Danville Railway Company:

| | |
|---|---|
| 1920 | $8,019.00 |
| 1921 | 11,995.82 |
| 1922 | 13,201.59 |
| 1923 | 14,011.49 |

The petitioner concedes that the foregoing amounts were erroneously allowed as deductions for the respective years, and that the petitioner's taxable income for said years may be increased by said respective amounts.

26. LOSS ON RETIREMENT OF PROPERTY ACQUIRED FROM THE DIRECTOR GENERAL OF RAILROADS WITHOUT COST: During the period of Federal control the Direc-

tor General of Railroads made various additions and betterments to the properties of the Southern Railway Company and various of its subsidiary companies, all of whom are included in the petitioner herein, at a cost to the Director General of $2,299,777.40. Said additions and betterments were included in the properties of said companies returned to them by the Director General of Railroads at the termination of Federal control at no cost to said companies. Said additions and betterments being the same property involved in paragraph 21 hereof and designated as "Additions and Betterments, Section 8 Claims". Said companies included in their respective investments accounts said cost to the Director General. During the years 1920 to 1923, inclusive, the said companies retired various of said properties based upon the cost thereof to said Director General.

In determining the consolidated net income of the petitioner for said years the respondent allowed as deductions from income losses upon said retirements based upon said cost to the Director General. Said losses were in the following amounts:

| | |
|---|---:|
| 1920 | $197.30 |
| 1921 | 6,790.58 |
| 1922 | 639.20 |
| 1923 | 11,718.77 |

The petitioner concedes that the respondent erroneously allowed as deductions from income the foregoing amounts for the respective years and now concedes that petitioner's taxable net income for said years may be increased in said respective amounts.

THE PARTIES HERETO FURTHER AGREE AS FOLLOWS:

That any deficiency and/or deficiencies in tax found by the Board against the petitioner (consolidated group) for any of the years herein involved may be allocated to and assessed against the Southern Railway Company, and any overpayment and/or overpayments of tax found by the Board may be refunded, if refundable, to the Southern Railway Company.

That the taxable net income of the petitioner for the months of January and February, 1920, is taxable at the rate of eight per cent., and the taxable net income of the petitioner for the months of March to December, 1920, both inclusive, is taxable at the rate of ten per cent.; that the determination of the portions of income and deductions, as finally determined by the Board for the year 1920, properly assignable to the said respective periods, may be submitted to the Board in connection and together with the submission of recomputation under Rule 50 of the Board.

That in the event the Board find a consolidated statutory net loss for any year herein involved, the determination of the amount thereof sustained by or the amount thereof assignable to the individual companies comprising the petitioner for the purpose of deduction thereof in subsequent years may be submitted to the Board in connection and together with the submission of the recomputation under Rule 50 of the Board.

Proper adjustments of these matters will be made in the recomputation under Rule 50, according to the stipulation.

### Items of Federal Control Settlement.

(A) Paragraph 13 of the stipulation is as follows:

13. FACTS RELATING TO FEDERAL CONTROL: By proclamation dated December 26, 1917, the President of the United States (acting under the power conferred

on him by the Constitution and laws of the United States, the Joint Resolutions of the Senate and House of Representatives, bearing dates of April 6, and December 7, 1917, respectively) took possession and assumed control at 12:00 o'clock noon, December 28, 1917, of certain railroads and systems of transportation, including the railroad and transportation system of the Southern Railway Company and its affiliated companies, designated in paragraph 1 hereof as common carriers.

By proclamation of March 29, 1918, the President of the United States, acting under the authority granted to him by the Federal Control Act, and all other powers vested in him by law, authorized the Director General of Railroads to agree with the owners of railroads or systems of transportation, upon the amounts to be paid to such owners for the assumption of control, use, maintenance, and operation of such properties, and for the return of such properties to their owners at the conclusion of Federal control.

Pursuant to said proclamation, the Mobile & Ohio Railroad Company and the New Orleans and Northeastern Railroad Company entered into such contract with the Director General of Railroads on February 7, 1920, and February 28, 1920, respectively, copies of which contracts are attached hereto as Exhibits 9 and 10, respectively. The Southern Railway Company and its other affiliated common carrier companies did not enter into such contract with the Director General of Railroads.

In accordance with the terms of the Act of Congress dated February 28, 1920, referred to as "Transportation Act, 1920", the President of the United States relinquished to the common carrier companies, included in petitioner herein, as of February 29, 1920, their respective properties comprising their respective railroads and system of transportation.

Subsequent to the relinquishment of said properties, each of the said common carriers companies whose properties were operated by the Director General filed a claim with the Director General of Railroads setting out amounts appearing on their respective books as due to and from the Director General of Railroads and certain other amounts not on their books but claimed to be due to or from said Director General of Railroads.

Final settlements of said claims were reached by the companies and the Director General on various and divers dates. Exhibit " C " to the original petition in Docket No. 21481 correctly shows the names of the said common carrier companies involved herein whose properties were operated by the Director General during Federal control, the dates of final settlements of the respective claims filed with the said Director General and the amounts paid by or to the said Director General in such final settlement. Copies of the agreements of said final settlements are attached hereto and made parts hereof, marked Exhibits 11–A to 11–P, respectively.

(The amount of $8,357,730, mentioned in the Director General's allocation, Exhibit 12–A hereinafter attached, as the amount allowed in final settlement to Southern Railway Company, is $54,270 less than the amount of $8,412,000 allowed as shown by the final settlement agreement, Exhibit 11–A hereto, by reason of the Director General's failure to include in said allocation a transaction with respect to certain notes of the Southern Railway Company held by the Director General and by him surrendered to Southern Railway Company in final settlement. This item is not in controversy.)

A summary of each of said claims, together with the allocations respectively, of the final settlements thereof to the various items contained in said claims, as such allocations were made by the Director General of Railroads, is

attached hereto and made parts hereof, marked Exhibits 12–A to 12–P, respectively, it being agreed that nothing contained in this stipulation is to be construed to mean that petitioner concedes that it was or is bound by said allocations, and the determination of the respondent, or that it is precluded from proving the contrary.

On or about January 25, 1922, the Interstate Commerce Commission issued an order, a true copy of which is attached hereto and made a part hereof, marked Exhibit 13, whereunder the books of the companies which were under Federal control were required to be and were cleared of all balance sheet items or accounts incident thereto or affected in connection with the matters growing out of Federal control.

Exhibits 9 to 13, inclusive, of the stipulation are incorporated herein by reference.

The following statement shows the amount of the claim filed with the Director General by each of the Federal controlled companies:

| Company | Amount of claim | Company | Amount of claim |
|---|---|---|---|
| Southern Railway Company | $40,204,822.49 | Delta Southern Railway | $148,004.59 |
| Asheville & Craggy Mountain Railway Company | 28,748.40 | Hartwell Railway Company | 28,982.95 |
| | | Mobile & Ohio Railroad Company | 4,299,604.44 |
| Atlantic & Yadkin Railway Company | 547,299.37 | New Orleans & Northeastern Railroad Company | 3,181,011.50 |
| Blue Ridge Railway Company | 84,624.61 | New Orleans Terminal Company | 2,050,723.59 |
| Carolina & Tennessee Southern Railway Company | 68,851.87 | Northern Alabama Railway Company | 613,889.70 |
| Columbus & Greenville Railroad Company (formerly Southern Railway Company in Mississippi) | 463,941.44 | St. Johns River Terminal Company | 7,332.17 |
| Cumberland Railroad Company | 41,725.56 | Tallulah Falls Railway Company | 248,641.08 |
| Danville & Western Railway Company | 305,295.76 | Total | 52,323,499.52 |

Included in the claims were certain items representing charges against and credits to the Director General which were not in dispute. The principal items in controversy were the claims for undermaintenance of properties, shortages of materials and supplies, additional compensation, and additions and betterments made by the Director General not approved by the companies.

During 1920 and 1921 numerous conferences were held between representatives of the petitioner and the Director General with regard to the claims; and at the conferences the petitioner's representatives discussed and pressed all items of the claims, including additional compensation, but particularly undermaintenance, which item consumed 95 per cent of the arguments at the conferences.

In June, 1921, numerous personal conferences were held between the vice president and general counsel of the Southern Railway Company and the Director General in an effort to reach an early settlement of that company's claim. The Director General made several successive offers to pay certain sums in settlement of the entire claim, offering sums of approximately $4,000,000, and $5,-

000,000, and finally offering on June 15, 1921, to pay the company the sum of $6,000,000 in cash and to cancel notes of the company held by the United States Railroad Administration, aggregating $2,412,000, which offer, in the total sum of $8,412,000 was accepted by petitioner on that date. In these personal conferences, the specific items of the company's claim were not discussed, and the Director General did not indicate to the company's representative that he was conceding any specific items of the claim. The final settlement agreed upon, which was embodied in a contract bearing date of June 22, 1921, was a lump sum intended to wipe out and cancel the claims of both sides.

The final settlements of the claims of the other Federal controlled companies were effected during 1921, 1922 and 1923, on a similar basis and in a manner similar to the Southern Railway Company settlement, in personal conferences between their representative and the Director General, no specific items having been discussed or conceded by the Director General.

In no case did the Director General or his agents ever disclose to petitioner any specific allowances made on particular items claimed, and petitioner was never advised by the Director General as to any entries on his books showing the allocation of the settlements.

The following statement shows for each of the Federal controlled companies, the year of final settlement of its claim against the Director General, and the amount paid by the Director General to the company or by the company to the Director General in final settlement:

| | Final settlement | |
|---|---|---|
| | Date | Amount paid |
| Southern Railway Company | 6/22/21 | $8,412,000 |
| Asheville & Craggy Mountain Railway Company | 10/20/21 | 5,500 |
| Atlantic & Yadkin Railway Company | 12/21/21 | 120,000 |
| Blue Ridge Railway Company | 1/27/22 | 5,500 |
| Carolina & Tennessee Southern Railway Company | 10/20/21 | 5,000 |
| Columbus & Greenville Railroad Company (formerly Southern Railway Company in Mississippi) | 2/24/22 | 30,000 |
| Cumberland Railroad Company | 1/31/22 | 12,000 |
| Danville & Western Railway Company | 10/20/21 | 260,000 |
| Delta Southern Railway | 1/24/22 | 60,000 |
| Hartwell Railway Company | 10/20/21 | 24,500 |
| Mobile & Ohio Railroad Company | 9/8/21 | 700,000 |
| New Orleans & Northeastern Railroad Company | 11/9/23 | 1,400,000 |
| New Orleans Terminal Company | 11/9/23 | 1,300,000 |
| Northern Alabama Railway Company | 6/27/22 | 125,000 |
| St. Johns River Terminal Company | 11/13/23 | 18,000 |
| Tallulah Falls Railway Company | 1/27/22 | 3,000 |
| Total of payments by Director General | | 12,462,500 |
| Total of payments by companies | | 18,000 |
| Net payments by Director General | | 12,444,500 |

On his books, the Director General allocated the final settlements with the Federal controlled companies as follows:

| | Debits | Credits |
|---|---|---|
| (1) Compensation | | $52, 169, 390. 32 |
| (2) Compensation, New Orleans Terminal Company | | 1, 213, 333. 33 |
| (3) Payments made on compensation | $32, 111, 797. 89 | |
| (4) Rental interest on completed A. & B | | 391, 347. 60 |
| (5) Cash on hand December 31, 1917 | | 9, 770, 666. 26 |
| (6) Agents' and Conductors' balances 12/31/17 | | 2, 202, 798. 13 |
| (7) Assets December 31, 1917 collected | | 14, 917, 740. 02 |
| (8) Revenues prior to January 1, 1918 | | 2, 876, 027. 09 |
| (9) Liabilities December 31, 1917 paid | 28, 402, 092. 74 | |
| (10) Corporate transactions | 11, 163, 356. 01 | |
| (11) Expenses prior to January 1, 1918 | 4, 642, 352. 05 | |
| (12) Equipment retired | | 1, 096, 641. 80 |
| (13) Road property retired and not replaced | | 132, 101. 47 |
| (14) Back mail pay | | 244, 800. 38 |
| (15) Profit on material sold | | 559, 734. 33 |
| (16) Additions and betterments, Section 8 claims | | 2, 299, 777. 40 |
| (17) Interest on New Orleans Terminal Co. bonds | | 280, 000. 00 |
| (18) Allocated equipment rental | | 78, 852. 17 |
| (19) Additions and betterments | 16, 266, 311. 27 | |
| (20) Additions and betterments to allocated equipment | 363. 29 | |
| (21) Estimated recoveries by Field Section | 820, 035. 80 | |
| (22) Miscellaneous accounts receivable | 597. 12 | |
| (23) Allocated equipment—Due on cost | 152, 811. 51 | |
| (24) Interest other than rental interest | 306, 086. 17 | |
| (25) Depreciation on equipment | | 5, 712, 191. 23 |
| (26) Undermaintenance: | | |
|     Way and structures $7, 082, 654. 65 | | |
|     Equipment 4, 883, 544. 70 | | 11, 966, 199. 35 |
| (27) Reparation of capital | | |
| (28) Material & supplies: Southern Ry. Co | | |
| (29) Adjustment Southern Ry. Co.—Notes | | 54, 270. 00 |
| (30) Cost of Valuation Order No. 3 | | 54, 394. 95 |
| (31) Material and supplies—Excess | 262, 303. 71 | |
| (32) Material and supplies—Shortage | | 678, 853. 85 |
| (33) A. & B. adjustment of bills on M. & S. used in A. & B. work | 97, 552. 63 | |
| (34) Miscellaneous | 28, 959. 49 | |
| (35) Three year notes | 2, 412, 000. 00 | |
| (36) Cash | 10, 032, 500. 00 | |
| Total | 106, 699, 119. 68 | 106, 699, 119. 68 |

The petitioner's allocation of the final settlements with the Director General is as follows:

| | Debit | Credit |
|---|---|---|
| (1) Compensation | $47, 332, 625. 74 | |
| (2) Compensation, New Orleans Terminal Company | 1, 213, 333. 33 | |
| (3) Payments made on compensation | | $32, 111, 797. 89 |
| (4) Rental interest on completed A. & B | 391, 347. 60 | |
| (5) Cash on hand December 31, 1917 | 9, 770, 666. 26 | |
| (6) Agents' and Conductors' balances 12/31/17 | 2, 202, 798. 13 | |
| (7) Assets December 31, 1917 collected | 14, 917, 740. 02 | |
| (8) Revenues prior to January 1, 1918 | 2, 876, 027. 09 | |
| (9) Liabilities December 31, 1917 paid | | 28, 402, 092. 74 |
| (10) Corporate transactions | | 11, 163, 356. 01 |
| (11) Expenses prior to January 1, 1918 | | 4, 642, 352. 05 |
| (12) Equipment retired | 1, 096, 641. 80 | |
| (13) Road property retired and not replaced | 132, 101. 47 | |
| (14) Back mail pay | | |
| (15) Profit on material sold | | |
| (16) Additions and betterments, Section 8 claims | 2, 299, 777. 40 | |
| (17) Interest on New Orleans Terminal bonds | | |
| (18) Allocated equipment rental | 78, 852. 17 | |
| (19) Additions and betterments | | 16, 266, 311. 27 |
| (20) Additions and betterments to allocated equipment | | 363. 29 |
| (21) Estimated recoveries by Field Section | | 820, 035. 80 |
| (22) Miscellaneous accounts receivable | | 597. 12 |
| (23) Allocated equipment—Due on cost | | 152, 811. 51 |
| (24) Interest other than rental interest | | 306, 086. 17 |
| (25) Depreciation on equipment | 5, 712, 191. 23 | |
| (26) Undermaintenance | | |

| | Debit | Credit |
|---|---|---|
| (27) Reparation of capital_____ | $19, 427, 485. 90 | _____ |
| (28) Materials & Supplies: Southern Ry. Co. | | |
|    Value of material turned over 12/31/17_____ $11, 226, 862. 00 | | |
|    Value of material turned back 2/29/20_____ 12, 766, 849. 26 | | |
| | _____ | $1, 539, 987. 26 |
| (29) Adjustment Southern Ry. Co.—Notes_____ | 54, 270. 00 | _____ |
| (30) Cost of Valuation Order No. 3_____ | 54, 394. 95 | _____ |
| (31) Material and supplies—Excess_____ | _____ | 262, 303. 71 |
| (32) Material and supplies—Shortage_____ | 678, 853. 85 | _____ |
| (33) A. & B. adjustment of bills on M. & S. used in A. & B. work_____ | _____ | 97, 552. 63 |
| (34) Miscellaneous_____ | _____ | 28, 959. 49 |
| (35) Three year notes_____ | _____ | 2, 412, 000. 00 |
| (36) Cash_____ | _____ | 10, 032, 500. 00 |
|     Total_____ | 108, 239, 106. 94 | 108, 239, 106. 94 |

The following is a statement of the differences between the petitioner's and the Director General's allocations of the final settlements:

| | Petitioner's allocation | Director General's allocation |
|---|---|---|
| (1) Compensation_____ | $47, 332, 625. 74 | $52, 169, 390. 32 |
| (14) Back mail pay_____ | _____ | 244, 800. 38 |
| (15) Profit on material sold_____ | _____ | 559, 734. 33 |
| (17) Interest on New Orleans Terminal Co. bonds_____ | _____ | 280, 000. 00 |
| (26) Undermaintenance_____ | _____ | 11, 966, 199. 35 |
| (27) Reparation of capital_____ | 19, 427, 485. 90 | _____ |
| (28) Materials & supplies; Southern Ry. Co_____ | ¹ 1, 539, 987. 26 | _____ |
|     Total_____ | 65, 220, 124. 38 | 65, 220, 124. 38 |

¹ *Italic* figures representing credit to the Director General.

After final settlements with the Director General, the petitioner, in accordance with the Interstate Commerce Commission's order, cleared its books of accounts relating to matters of Federal control, which resulted in a net credit to profit and loss accounts of $23,421,-666.92. The years and amounts of the credits to profit and loss accounts are as follows:

| | |
|---|---|
| 1921_____ | $20, 939, 369. 93 |
| 1922_____ | 627, 340. 05 |
| 1923_____ | 1, 843, 293. 75 |
| 1924_____ | 3, 567. 38 |
| 1925_____ | 8, 095. 81 |
|     Total_____ | 23, 421, 666. 92 |

The respondent determined that the said net credit of $23,421,-666.92 to profit and loss accounts was made up of items allowed by the Director General in final settlements, as follows:

| Item | Amount | Item | Amount |
|------|--------|------|--------|
| (1) Undermaintenance | $11,966,199.35 | (10) Back mail pay | $5,000.00 |
| (2) Materials and supplies | 2,637,992.86 | (11) Corporate transactions | 17,470.69 |
| (3) Interest on quarterly balances | 1 121,116.96 | (12) Expenses prior to January 1, 1918 | 1 12,778.20 |
| (4) Profit on equipment retired | 9,876.88 | | |
| (5) Rental interest on allocated equipment | 89,124.02 | (13) Compensation New Orleans Terminal Company | 1,213,333.33 |
| (6) Amount to balance | 7,527,468.42 | (14) Property retired and not replaced | 1 2,850.68 |
| (7) Rental interest on additions and betterments | 69,746.54 | | |
| (8) Revenue prior to January 1, 1918 | 17.76 | Total | 23,421,666.92 |
| (9) Cost to comply Valuation Order No. 3 | 22,182.91 | | |

1 *Italic* figures representing debits against the companies.

Item (6) of the respondent's allocation, described as "Amount to balance, $7,527,468.42," includes, among other debit and credit items, the following credit items:

Additional compensation_____ $4,836,764.58

Rental interest on completed additions and betterments_____ 321,601.07

Back mail pay_____ 239,800.38

Additions and betterments_____ 2,299,777.40

Interest on New Orleans Terminal Company bonds_____ 280,000.00

(B) Paragraph 14 of the stipulation is as follows:

14. UNDERMAINTENANCE: In the final settlements with the Director General of the claims of the various carrier companies by him during the period of Federal control, there was allowed as undermaintenance by him to such respective carriers for his failure to maintain their respective properties during said period of Federal control not less than the following amounts:

| | Undermaintenance, Way and Structures | Undermaintenance Equipment | Total |
|---|---|---|---|
| Southern Railway Company | $6,175,593.30 | $4,783,728.86 | $10,959,322.16 |
| Mobile & Ohio R. R. Co | 429,276.04 | | 429,276.04 |
| New Orleans & Northeastern R. R. Co | 90,378.95 | | 90,378.95 |
| Atlantic & Yadkin Ry. Co | 50,468.75 | 57,093.00 | 107,561.75 |
| Carolina & Tennessee Southern Ry. Co | 2,389.55 | | 2,389.55 |
| Tallulah Falls Ry. Co | | 8,544.40 | 8,544.40 |
| Asheville & Craggy Mt. Ry. Company | 7,974.13 | 1,454.00 | 9,428.13 |
| Blue Ridge Ry. Co | | 426.00 | 426.00 |
| Delta Southern Ry | 39,152.89 | 15,314.00 | 54,466.89 |
| Hartwell Ry. Co | 4,402.44 | | 4,402.44 |
| Northern Alabama Ry. Co | | 16,673.95 | 16,673.95 |
| St. Johns River Terminal Co | | 310.49 | 310.49 |
| New Orleans Terminal Co | 102,209.04 | | 102,209.04 |
| Columbus & Greenville R. R. Co | 180,809.56 | | 180,809.56 |
| Total | | | 11,966,199.35 |

The maintenance expenditure of said respective companies, during the last ten months of 1920, exceeded the above respective amounts, aggregating $11,966,199.35.

During the period of Federal control the Director General of Railroads did not adequately maintain the properties of petitioner as provided by the Federal Control Act (and by the contracts with those companies of petitioner with

which he had contracts), as a result of which said properties were returned to petitioner at the end of Federal control undermaintained in many respects. Petitioner concedes that during the last 10 months of the year 1920 it repaired many of the worst conditions of undermaintenance in its way, structures, and equipment existing when its properties were returned, and that it charged the cost of such repairs to operating expenses and deducted same from taxable income, and the respondent concedes that the petitioner is not precluded by this Stipulation from proving that it was able to make such repairs by deferring, or that it did defer, less pressing items of current maintenance, of equivalent importance, until after said last 10 months of 1920.

In determining the consolidated taxable net income of the petitioner for the year 1920, the respondent disallowed as a deduction for operating expenses the petitioner's maintenance expenditures to the extent of the amounts allowed for undermaintenance by the Director General and stated his reason for such disallowance (item (b) of schedule 1–A of the sixty-day letter which is attached as Exhibit A to the petition in Docket 21481) as follows:

"(b) This amount representing expenditures made subsequent to Federal control to rehabilitate your property to the extent of undermaintenance of ways and structures and equipment during Federal control for which you were allowed payment in final settlement with the Director General of Railroads, is held not to be an allowable deduction from gross income. This transaction falls within the provisions of Articles 49 and 50 of Regulations 45 with respect to the compulsory conversion of property and also Sections 214 (a) (12) and 234 (a) (14) of the Revenue Act of 1921."

The following statement shows the respective amounts of undermaintenance included in the claims filed by the Federal controlled companies with the Director General:

| Company | Amount of undermaintenance claimed | Company | Amount of undermaintenance claimed |
|---|---|---|---|
| Southern Railway Company | $27,764,447.79 | Delta Southern Railway | $91,691.55 |
| Mobile & Ohio Railroad Company | 3,385,290.20 | Hartwell Railway Company | 5,277.07 |
| New Orleans & Northeastern Railroad Company | 1,502,649.79 | Northern Alabama Railway Company | 207,971.29 |
| Atlantic & Yadkin Railway Company | 268,201.54 | St. Johns River Terminal Company | 23,708.77 |
| Carolina & Tennessee Southern Railway Company | 8,111.60 | New Orleans Terminal Company | 711,583.27 |
| Tallulah Falls Railway Company | 91,632.22 | Columbus & Greenville Railroad Company | 577,365.68 |
| Asheville & Craggy Mountain Railway Company | 26,934.59 | Danville & Western Railway Company | 2,714.06 |
| Blue Ridge Railway Company | 70,651.38 | Total | 34,738,230.80 |

The claims of the companies for undermaintenance, aggregating $34,738,230.80, as shown above, were not intended to, nor did they, specify specific items of damage, but were prepared on the basis of formulæ prescribed by the Director General in his Accounting Circulars Nos. 101 and 109, with supplements thereto, supplemented by formulæ of petitioner's own conception; they were based on statistical comparisons of maintenance expenditures rather than on enumeration of physical assets that were destroyed or in a state of dis-

repair, and did not inventory the property as to its state of repair on March 1, 1920.

The following statement shows the number of units of the principal materials applied in maintenance of way and structures, in an average ten months of the test period (the test period being the period July 1, 1914, to June 30, 1917), in the last ten months of 1920, and using the former as the norm, the excess or shortage in the number of units applied in the latter period:

| | Average 10 months of test period | Last 10 months of 1920 | Shortage | Excess |
|---|---|---|---|---|
| Cross ties (number) | 4, 035, 461 | 3, 393, 226 | 642, 235 | |
| Switch ties (board feet) | 9, 309, 992 | 8, 313, 345 | 996, 647 | |
| Bridge ties (board feet) | 3, 689, 210 | 2, 435, 562 | 1, 253, 648 | |
| New rail (tons) | 33, 795. 21 | 15, 742. 99 | 18, 052. 22 | |
| Secondhand rail (tons) | 31, 294. 3000 | 21, 039. 5036 | 10, 254. 7964 | |
| Untreated lumber (board feet) | 21, 563, 649 | 23, 139, 532 | | 1, 575, 883 |

Based upon average 1920 prices paid for similar materials, the net shortages indicated by the foregoing statement represent an underapplication of principal materials in maintenance of way and structures for the last 10 months of 1920, as compared with the test period, of approximately $1,900,000.

The following statement shows the number of man hours of labor applied in maintenance of way and structures, in an average ten months of the test period, in the last ten months of 1920, and, using the former as the norm, the excess or shortage in the number of man hours applied in the latter period:

| | Average 10 months of test period | Last 10 months of 1920 | Shortage | Excess |
|---|---|---|---|---|
| Section foremen (hours) | 4, 153, 422 | 3, 630, 440 | 522, 973 | |
| Section men (hours) | 19, 199, 865 | 19, 320, 970 | | 121, 105 |
| Bridge & Building forces (hours) | 3, 421, 501 | 2, 880, 908 | 540, 593 | |

The general physical condition of the Federal controlled companies' ways and structures was not as good on December 31, 1920, as on March 1, 1920; and in June, 1921, the said properties were still undermaintained as compared with the maintenance standard of the test period.

With reference to maintenance of equipment, the general condition of passenger cars, with regard to the percentages thereof in bad order, slightly improved between March 1, 1920, and December 31, 1920, there having been 8.41 per cent and 8.21 per cent of Southern Railway System passenger cars in bad order on those dates, respec-

tively. As to freight train cars, 2.90 per cent of all revenue cars on line at March 1, 1920, were in bad order, while at December 31, 1920, the percentage had grown to 4.71. With regard to locomotives, 16.61 per cent of Southern Railway System locomotives were out of service for repairs at March 1, 1920, while at December 31, 1920, the percentage had grown to 18.29 per cent. These figures, though including Southern Railway System lines, some of which lines are not involved in these proceedings, are representative of the condition of equipment on the railroads comprising petitioner, 78 per cent of the passenger cars, 76 per cent of the freight train cars, and 85 per cent of the locomotives referred to above being owned by the Southern Railway Company alone.

Locomotive repairs represent approximately 50 per cent of the money spent by petitioner in 1920 for maintenance of equipment, and the conditions in the locomotive repair department are representative of the freight train car repair department. Locomotive repairs are divided into two classes, known as " Classified Repairs," which consist of such repairs as serve to rehabilitate or replace the fundamental parts of a locomotive, and " Running Repairs," which consist of the minor repairs that come up purely in the operation of the locomotive and which do not restore or rehabilitate the condition of the locomotive to any material extent. During the test period, the Southern Railway Company expended for classified repairs 40.72 per cent of its entire expenditures for locomotive repairs, while in the last 10 months of 1920 it expended only 27.25 per cent of its total locomotive repair expenditures for that class of repairs. Its expenditures for temporary or running repairs in the test period and in the last 10 months of 1920 were 59.28 per cent and 72.75 per cent, respectively, of the total locomotive repair expenditures of those periods.

The general physical condition of the Federal controlled companies' equipment was not as good on December 31, 1920, as on March 1, 1920.

During 1920 the corporations composing petitioner were in a very serious financial condition. They came out from Federal control with empty treasuries; they were obliged to borrow money to meet pay rolls; they were suffering from complete disorganization; prices for labor and materials were the highest in history; and during the entire year 1920 all of the companies composing petitioner were in straitened circumstances from a financial standpoint, and in 1921, when the Southern Railway Company made its settlement of the Federal control claim with the Director General, it and its subsidiaries were on the verge of bankruptcy.

The percentages respectively of total operating expenses expended for maintenance by the Southern Railway Company alone, and by

the Southern Railway and its subsidiaries, for the various periods shown below, were as follows:

| Year or period | Southern Ry. Co. | Southern Ry. Co. and subsidiaries | Year or period | Southern Ry. Co. | Southern Ry. Co. and subsidiaries |
|---|---|---|---|---|---|
| 1909 | 39.95 | 39.87 | 1915 | | |
| 1910 | 42.74 | 42.36 | 1916 }Test period | 41.83 | 41.92 |
| 1911 | 41.36 | 40.99 | 1917 | | |
| 1912 | 41.08 | 40.80 | Average for 9 years, 1909 to 1917, inclusive | 41.70 | 41.59 |
| 1913 | 42.60 | 42.36 | Last 10 months 1920 | 39.85 | 41.18 |
| 1914 | 41.67 | 41.69 | | | |

Making due allowances for differences (1) in the purchasing power of the dollar, (2) in amount of property maintained, and (3) in the use of property maintained, as between the test period and the last 10 months of 1920, the expenditures of the Federal controlled companies for maintenance of ways, structures, and equipment were less in the last 10 months of 1920 than in an average 10 months of the test period, by approximately $1,300,000.

Since the end of Federal control, petitioner (the consolidated group) expended an aggregate amount to and including the year 1926, of $23,771,325.54 for maintenance betterments, all of the same being chargeable under the classifications of the Interstate Commerce Commission, and being charged to capital accounts. The appropriations for these expenditures were set aside out of profit and loss, and exceeded by more than $300,000 the net credit to profit and loss account growing out of the clearance to that account of the accounts relating to Federal control matters. None of these expenditures so appropriated, set aside, and expended from profit and loss were paid for by the issuance of petitioner's securities; none of the same were charged to operating expenses, nor have they been claimed as deductions in income tax returns. These maintenance betterments were improvements and betterments made by petitioner to ways, structures, and equipment, being improvements of existing facilities or units of equipment through substitution of superior parts for inferior parts, or the difference in value between obsolete equipment retired and new cars or power acquired.

During 1920 the Southern Railway Company, as the parent company, controlled the subsidiary companies which received under maintenance allowances from the Director General, through holdings of their respective issues of capital stock, to the following extent:

| Company | Per- cent- age of control | Company | Per- cent- age of control |
|---|---|---|---|
| Mobile & Ohio Railroad Company | 94.76 | Blue Ridge Railway Company | 100.00 |
| New Orleans & Northeastern Railroad Company | 99.42 | Delta Southern Railway Company | 100.00 |
| Atlantic & Yadkin Railway Company | 100.00 | Hartwell Railway Company | 100.00 |
| Carolina & Tennessee Southern Railway Company | 100.00 | Northern Alabama Railway Company | 94.77 |
| Tallulah Falls Railway Company | 100.00 | St. Johns River Terminal Company | 100.00 |
| Asheville & Craggy Mountain Railway Company | 100.00 | New Orleans Terminal Railway | 100.00 |
|  |  | Columbus & Greenville Railroad Company | 100.00 |

During that year the controlling executive officers, both of the Southern Railway Company and of each of the subsidiary corporations, were Fairfax Harrison as president, L. E. Jeffries as vice president and general counsel, and E. H. Kemper as comptroller and chief accounting officer. Harrison, as president, directly controlled the general policy of all of these corporations.

(C) Paragraph 15 of the stipulation is as follows:

15. MATERIAL AND SUPPLIES: The petitioner concedes the adjustment made by the respondent with respect to this issue, Schedule 1–A of the sixty-day letter, beginning on page 28 of the petition, Docket No. 21481, except to the extent of $2,099,721.59 which applies solely to the Southern Railway Company and is described on the first line of the tabulation which appears on page 29 of the petition in said Docket No. 21481.

With reference to the item of $559,734.33, included in said first line of the tabulation hereinbefore referred to, it is agreed that the Director General in the final settlement with Southern Railway Company allocated (petitioner, however, not conceding that it was or is bound by said allocation, and the determination of the respondent, and respondent agreeing that petitioner is not precluded from proving the contrary) said amount of $559,734.33 to an item called "Net Profit on Rail", which corresponds to certain profits on rail sold, and/or used in construction, by the Director General during Federal control, such profits having been realized by the Director General during the following years:

| | |
|---|---|
| 1918 | $453,098.21 |
| 1919 | 74,430.06 |
| 1920 | 32,206.06 |
| Total | 559,734.33 |

Said net profit on rail was credited by the Director General to his Profit and Loss account by the fololwing respective entries made in the months indicated:

| | |
|---|---|
| March, 1919, Journal entry #44 | $464,429.15 |
| December, 1919, Journal entry #127 | 63,099.12 |
| February, 1920, Journal entry #122 | 32,206.06 |
| Total | $559,734.33 |

The amount in controversy here, $2,099,721.59, is shown by the deficiency notice to be made up of two items: $1,539,987.26, representing the difference between the value of the inventory turned over

by the Southern Railway Company to the Director General and the value of the inventory turned back to the Southern Railway by the Director General, and $559,734.33 representing the profit realized by the Director General from the sale of rail during Federal control.

At the beginning of Federal control the Southern Railway Company turned over to the Director General an inventory of material and supplies of the cost value of $11,226,862, and charged that amount on its books to an account styled " U. S. Government—Material and Supplies—December 31, 1917 ". At the end of Federal control, the company received back from the Director General an inventory of material and supplies of the cost value of $12,766,849.26, and pursuant to General Order No. 66, issued by the United States Railroad Administration as of February 24, 1920, the company credited that amount on its books to its account with the Director General. The said charge of $11,226,862 and the said credit of $12,766,849.26, representing a net credit in favor of the Director General of $1,539,-987.26, were on the books of the Southern Railway Company at the date of final settlement of its claim with the Director General. Pursuant to the order of the Interstate Commerce Commission of January 25, 1922, requiring the books of the companies which had been under Federal control to be cleared of all balance sheet items or accounts relating to Federal control matters, the said charge against, and credit to, the Director General were cleared into profit and loss account, the net credit of $1,539,987.26 being a portion of the total credits to profit and loss referred to in subdivision (A) of this opinion, amounting in the aggregate to $23,421,666.92.

In its claim filed with the Director General at the end of Federal control the Southern Railway Company claimed $1,832,832 for shortages in materials and supplies. At the time of final settlement of its claim, representatives of the Director General were engaged in checking the two inventories for the purpose of determining liability for shortages or overages of material units. The work of comparing the two inventories was never completed, the Director General's representatives discontinuing the work upon being advised by telephone that final settlement with the Southern Railway Company had been effected.

Some undisclosed portion of the material and supplies included in the inventory the Southern Railway Company received back from the Director General was used in making additions and betterments and was charged to capital accounts and not to operating expenses. Of the total inventory so received back from the Director General, there remained on hand and not used at December 31, 1920, items included in the said inventory at a total value of $234,152.94, and such items were not charged out to operating expenses in 1920.

Respondent determined that the Southern Railway Company had charged the entire inventory received back from the Director General to operating expenses of the last 10 months of 1920, at the cost value thereof, $12,766,849.26, and, consequently, that the operating expenses reported in the company's income tax return were overstated by $1,539,987.26, the difference between the first mentioned figure and $11,226,862, the cost value of the inventory turned over to the Director General by the Southern Railway Company at the beginning of Federal control, and he has disallowed $1,539,987.26 of the total operating expenses deducted by the Southern Railway Company in its return.

The Southern Railway Company's claim against the Director General included a separate item of $559,734.33. The basis of the claim for the allowance of this item is stated in the claim as follows:

During the period of Federal control there was credited to Profit & Loss on the Southern Railroad Federal books and transferred to Administration Ledger Control Account amounts representing (a) net profit on rail sold by the Director General being the difference between the amount at which the rail was carried in the Material and Supply account and the amount for which the rail was sold; (b) the difference between the amount at which rail was carried and Material and Supply account and the amount at which the rail used in Additions and Betterments was charged to that account.

It should be explained that relay rail when removed from the track is charged to Material and Supply account at a fixed rate of $20.00 per ton, which is credited to Operating Expenses, and that such rail when again used in maintenance is charged back to Expenses at $20.00 per ton. However, when sold or used in Additions or Betterments, different prices are applied, thereby creating a surplus in the Material and Supply account. This surplus was during the period of Federal control erroneously credited to Profit and Loss.

It is admitted that the profit representing the difference between stock prices of relay rail and its cost should have been credited to Operating Expenses, which would have decreased the expenditures made by the Director General for upkeep of the property, thereby increasing the claim of the corporation for under-maintenance. This claim is presented for the entire profit on rail sold or used for purposes other than maintenance, in preference to attempting adjustments in the reports already filed with the Railroad Administration under Accounting Circular 101.

It is contended that this profit should not have been credited to Federal Profit and Loss but that an undetermined proportion representing the difference between the stock prices of relay rail and its cost should have been credited to Operating Expenses when the rail was disposed of by sale or use in Additions and Betterments, and that the remaining proportion should have been credited to the corporation as profit on sale of property belonging to it. The amounts are reflected in Southern Railroad Federal books as follows:

| | Sold | Charged Additions & Betterments | Total |
|---|---|---|---|
| Mar. 1919 Disbursing J. E. 44_____ | $256,525.12 | $207,904.03 | $464,429.15 |
| Dec. " " " 127_____ | 18,666.93 | 44,432.19 | 63,099.12 |
| Feb. " " · " 122_____ | 21,389.97 | 10,816.09 | 32,206.06 |
| Total _____ | $296,582.02 | $263,152.31 | $559,734.33 |

Respondent reduced Southern Railway Company's operating expenses for 1920 by $559,734.33.

(D) Paragraph 17 of the stipulation is as follows:

17. BALANCES CREDITED TO PROFIT AND LOSS ON ACCOUNT OF SETTLEMENT WITH THE UNITED STATES RAILROAD ADMINISTRATION: The respondent, in determining the consolidated net income of the petitioner for the calendar years 1921, 1922, and 1923, increased the reported taxable net income in the amounts of $7,250,-960.81, $276,507.61, and $1,351,692.56, respectively.

After settlement was effected with the Director General of the claims growing out of Federal control the petitioner closed all of the accounts relating to Federal control matters and as a result thereof placed a net credit to its profit and loss account. Said net credit was reported by the petitioner as non-taxable income in its returns. Of that net credit the respondent has allocated to net income the sum of $7,250,960.81 to the year 1921, $276,507.61 to the year 1922, and $1,351,692.56 to the year 1923. In arriving at said amounts the respondent included as credits, and therefore in petitioner's consolidated taxable income for the above mentioned years, the following amounts or items determined by him to represent amounts allowed or paid to various of the companies included in the petitioner by the Director General of Railroads in the final settlements:

| | 1921 | 1922 | 1923 |
|---|---|---|---|
| Additional compensation | $4,831,354.65 | $5,409.92 | $1,213,333.34 |
| Rental interest on completed additions and betterments | 301,376.19 | 20,224.88 | 69,746.53 |
| Back mail pay | 236,322.77 | 3,477.61 | 5,000.00 |
| Additions and betterments, Section 8 claim | 2,064,461.18 | 235,316.22 | |
| Interest on N. O. Term bonds | 280,000.00 | | |

The petitioner concedes the correctness of the respondent's adjustment of all items making up the said net credits except that the petitioner contends that the respondent erred in including in said credits, and thus in petitioner's consolidated taxable income for said respective years, the foregoing specifically designated items.

If the Board holds that said designated items, or any one, or any part thereof, were not properly included in petitioner's taxable income in the respective years as above set forth, then to the extent it is so held in any year, the taxable net income of the petitioner as so determined by the respondent for said year shall be reduced.

(D-1) Paragraph 18 of the stipulation is as follows:

18. ADDITIONAL COMPENSATION—$4,836,764.58 AND $1,213,333.33: These items represent the aggregate amount determined by the respondent to have been allowed to various of the companies involved herein by the Director General of Railroads in his final settlements with said companies, as compensation for the use of their respective properties during Federal control in excess of the amounts certified by the Interstate Commerce Commission pursuant to the provisions of Section 1 of the Federal Control Act. There is attached hereto and made a part hereof, marked Exhibit 14, a list of the companies receiving said compensation as allocated by the Director General and as determined by the respondent, showing the years in which said compensation is included in taxable income, the amounts finally certified by the Interstate Commerce Commission as their respective annual railway operating income, the dates of the

respective final certificates, and the total compensation allowed the respective companies as allocated by the Director General in his final settlements and as determined by the respondent, and the differences between said amounts which constitute the said excess compensation now in dispute.

During the period of Federal control and until final settlements were made by the Director General of Railroads with said companies as set forth in Exhibit C to the original petition in Docket No. 21481, the question of the amounts of compensation to be paid to said companies for the use of their respective properties during said period was in dispute. At various and divers times throughout said period conferences were held by the Director General of Railroads and representatives of the respective companies in which the amounts of said compensation to be allowed said companies were discussed but at no time prior to the final settlements with said companies were agreements reached fixing the amount or amounts of said compensation.

Nothing herein shall be construed to mean that the petitioner concedes that the amounts of compensation paid said companies were ever agreed upon between said companies and said Director General or that any amount or amounts were paid or allowed said companies by said Director General in said final settlements as compensation in addition to the amounts finally certified by the Interstate Commerce Commission, or that the allocation of the Director General and the determination of the respondent was or is binding on petitioner, or that it is precluded from proving the contrary.

If the Board finds that said additional compensation was allowed or paid to said companies in the final settlements, but further finds that no part thereof should be included in the petitioner's taxable income for the respective years shown in Exhibit 14, and that said additional compensation was taxable income over the period of Federal control, then the total amount thereof allocable to and taxable as income to the petitioner during the period of Federal control is as follows:

|  | Additional Compensation to companies other than New Orleans Terminal Co. | Additional Compensation to New Orleans Terminal Co. |
|---|---|---|
| 1918 | $2,232,352.89 | $560,000.00 |
| 1919 | 2,232,352.89 | 560,000.00 |
| 1920 | 372,058.80 | 93,333.33 |
| Total | $4,836,764.58 | $1,213,333.33 |

The following statement shows, for each of the companies mentioned in Exhibit 14 of the stipulation, the amount of the compensation claimed, the date of the Interstate Commerce Commission's final certificate of standard return, the amount of the standard return certified by the Interstate Commerce Commission, the amount allocated to compensation in the Director General's allocation of the final settlements, the difference between the two last mentioned amounts included in taxable income by the respondent, and the year in which such difference was included in taxable income by the respondent:

| Company | Compensa-tion claimed | Date of final certifi-cate of I. C. C. | Standard re-turn certified by I. C. C. | Allocated to compensation by Director General | Difference included in-taxable in-come | Year includ-ed in tax-able income |
|---|---|---|---|---|---|---|
| (1) Southern Railway Company | $40,416,768.49 | 5/23/22 | $38,579,710.71 | $43,378,258.41 | $4,798,547.70 | 1921 |
| (2) Asheville & Craggy Mountain Railway Company | 10,946.00 | 11/9/18 | Deficit. | 6,167.21 | 6,167.21 | 1921 |
| (3) Atlantic & Yadkin Railway Company | 229,065.27 | 3/3/19 | Deficit. | 21,639.34 | 21,639.34 | 1921 |
| (4) Carolina & Tennessee Southern Railway Company | 60,060.00 | 3/3/19 | Deficit. | 5,000.00 | 5,000.00 | 1921 |
| (5) Danville & Western Railway Company | 293,189.72 | 11/9/18 | 292,797.56 | 292,797.81 | .25 | 1921 |
| (6) Delta Southern Railway | 52,926.38 | 6/9/19 | Deficit. | 5,409.83 | 5,409.83 | 1922 |
| (7) Mobile & Ohio Railroad Company | 5,676,938.34 | 8/18/20 | 5,669,779.38 | 5,669,779.53 | .15 | 1921 |
| (8) Northern Alabama Railway Company | 331,360.70 | 8/9/20 | 330,942.78 | 330,942.85 | .07 | 1922 |
| (9) New Orleans & Northwest-ern Railroad Company | 2,606,928.52 | 10/29/23 | 2,228,166.03 | 2,228,166.04 | .01 | 1923 |
| (10) Tallulah Falls Railway Company | 11,670.82 | 8/9/20 | 11,656.08 | 11,656.10 | .02 | 1922 |
| (11) New Orleans Terminal Company | 1,213,333.33 | 10/29/23 | Deficit. | 1,213,333.33 | 1,213,333.33 | 1923 |
| Total | 50,903,187.57 | -------- | 47,113,052.54 | 53,163,150.45 | 6,050,097.91 | |

Prior to the filing of the Southern Railway Company's claim against the Director General, the Interstate Commerce Commission had tentatively fixed the standard return of that company at $40,416,768.49.

The Southern Railway Company's claim against the Director General included a separate item of $10,338,031.10 for additional compensation. The basis of the claim for the allowance of this item is stated in the claim as follows:

### ADDITIONAL COMPENSATION.

I. Claim for abnormally depressed condition of business year 1915 _____ $1,347,224.67

II. Claim for extraordinary charges during the test period account of floods (one-third of $1,359,999.21) _____ 453,333.07

III. Claim for return on expenditures for additions and better-ments to road, and equipment _____ 2,970,841.23

Additional Annual Compensation Claim _____ $4,771,398.97

Two years, two months _____ $10,338,031.10

Early in 1920, during the Federal control, the general counsel of the United States Railroad Administration advised the general counsel of the Southern Railway Company, in writing, that the Director General would concede that the Southern Railway Company was entitled to compensation in addition to the standard return certified by the Interstate Commerce Commission. The Southern Railway Company, dissatisfied with the amount of the offer, rejected it at once, and no agreement was ever reached upon this item of the company's claim.

The Director General's allocation of the Southern Railway Company's final settlement shows that he allocated " an additional lump sum allowance of $5,500,000.00 for the period of Federal control " as additional compensation, over the standard return. The Southern Railway Company never claimed or furnished the Director General with a statement of that particular amount.

In the final settlement with the New Orleans Terminal Company, the Director General made an allowance to that company of $1,213,-333.33 for compensation for the use of the company's properties during the Federal control period.

(D-2) Paragraph 19 of the stipulation is as follows:

19. RENTAL INTEREST ON COMPLETED ADDITIONS AND BETTERMENTS—$391,-347.60: During the period of Federal control the Director General of Railroads made additions and betterments to the roadway and structures and to the equipment of the petitioner for which compensation was provided by Section 4 of the Federal Control Act (and by Section 7 (d) of the contracts of those companies which had contracts). The amount or amounts of said compensation allowed to the respective companies herein involved for the use of such additions and betterments by the Director General during the period of Federal control in the final settlements were as follows, grouped with respect to the years in which the amounts are included in taxable income by the respondent:

### 1921

| | |
|---|---:|
| Southern Railway | $267,177.07 |
| Asheville & Craggy Mountain Railway | 11.96 |
| Atlantic & Yadkin Railway | 2,721.70 |
| Mobile & Ohio Railroad | 31,086.32 |
| Carolina & Tennessee Southern Railway | 2.29 |
| Danville & Western Railway | 364.20 |
| Hartwell Railway | 12.65 |
| Total | $301,376.19 |

### 1922

| | |
|---|---:|
| Blue Ridge Railway | $795.30 |
| Delta Southern Railway | 9.54 |
| Northern Alabama Railway | 19,333.93 |
| Tallulah Falls Railway | 86.11 |
| Total | $20,224.88 |

### 1923

| | |
|---|---:|
| New Orleans & Northeastern Railroad | $69,746.53 |

Except for the Southern Railway Company and the Mobile & Ohio Railroad Company, the rate of compensation for the use of said additions and betterments was not determined by the Director General of Railroads prior to the dates of the final settlements with the respective companies.

With respect to the Southern Railway Company and the Mobile & Ohio Railroad Company, the Director General of Railroads and said companies agreed in 1920 upon the rate to be allowed for the use of the additions and betterments made to equipment, which rate was fixed at six per cent. of the cost thereof, in accordance with agreements which provided:

10. The Director General shall allow compensation at the rate of six per cent per annum under section 4 of the Federal Control Act and under paragraph (c) of Section 4 and (d) of Section 7 of the compensation contract upon the cost of equipment or of additions and betterments thereto. This agreement is made without prejudice to the fixing of the rate per centum to be paid upon cost of additions and betterments, less retirements in connection therewith (other than equipment), and upon the cost of road extensions.

No agreement was reached between said companies and said Director General fixing the rate to be allowed for the use of additions and betterments to roadway, and no determination of said rate was made by the Director General of Railroads prior to his final settlements with said companies.

Of the $267,177.07, rental interest on additions and betterments allowed to the Southern Railway Company, $232,302.85 was on cost of additions and betterments to equipment and the balance thereof, or $34,874.22, was allowed on the cost of additions and betterments to road.

Of the $31,086.32, rental interest on additions and betterments allowed to the Mobile & Ohio Railroad Company, $6,652.37 was on cost of additions and betterments to equipment and the balance thereof, or $24,433.95, was allowed on the cost of additions and betterments to road.

There was no dispute between any of the companies comprising petitioner and the Director General as to his liability for Rental Interest on Completed Additions and Betterments.

If the Board determines that the amounts of said rental interest on additions and betterments are not properly included in taxable income in the years of final settlement and finds:

(a) That said amounts of $232,302.85 and $6,652.37 were taxable in 1920 and that the balance was income over the period of Federal control, then the proper allocation is as follows:

| | |
|---|---:|
| 1918 | $30,913.30 |
| 1919 | 102,184.87 |
| 1920 | 258,249.43 |
| TOTAL | $391,347.60 |

or (b) that all of said rental interest was taxable income over the period of Federal control, then the proper allocation is as follows:

| | |
|---|---:|
| 1918 | $110,234.50 |
| 1919 | 239,173.07 |
| 1920 | 41,940.03 |
| TOTAL | $391,347.60 |

## (D-3) Paragraph 20 of the stipulation is as follows:

20. BACK MAIL PAY—$244,800.38: The amount or amounts allowed to the respective companies herein involved as allocated by the Director General of Railroads as back mail pay in final settlements and as determined by the respondent, are as follows, grouped with respect to the years in which the amounts are included in taxable income:

1921

| | |
|---|---:|
| Southern Railway | $214,567.36 |
| Danville & Western Railway | 1,755.41 |
| Mobile & Ohio Railroad | 20,000.00 |
| TOTAL | $236,322.77 |

1922

| | |
|---|---|
| Blue Ridge Railway_____ | $1,845.76 |
| Northern Alabama Railway_____ | 1,100.00 |
| Tallulah Falls Railway_____ | 531.85 |
| TOTAL _____ | $3,477.61 |

1923

| | |
|---|---|
| New Orleans & Northwestern Railroad_____ | $5,000.00 |

Pursuant to the provisions of Section 5 of the Act of Congress approved July 28, 1916 (39 Stat. 421, 425), the Interstate Commerce Commission made its report (56 I. C. C. 1) on December 23, 1919, as a result of which the above-named companies were paid additional compensation in 1920 for transporting the United States mail during the period November 1, 1916, to December 31, 1917. The above-named companies did not accrue said compensation during that period or prior to the date received. The payment so awarded pursuant to said report of the Interstate Commerce Commission is not the amount herein in controversy.

The said companies in prosecuting their claims before the Director General contended that the revenue accounts for the Test Period were understated by the amounts so awarded applicable to said Test Period, and that compensation for use of their properties during the Federal Control Period should comprehend said award and should be increased accordingly. No agreements were reached between the Director General and said companies with respect to this matter prior to dates when final settlements were effected. In including in the taxable income of the above-mentioned companies the above-mentioned amounts, the respondent determined that said amounts were allowed or paid to said companies in their respective final settlements.

Nothing herein shall be construed to mean that the petitioner concedes that the foregoing amounts were allowed or paid to said companies by the Director General in their respective final settlements, as determined by the respondent, or that the allocation of the Director General and the determination of the respondent was or is binding on petitioner, or that it is precluded from proving the contrary.

If the Board finds that the above-mentioned companies received in their final settlements with the Director General the amounts above set forth and further finds that said amounts should not be included in petitioner's taxable income for said respective years, but finds that said amounts are taxable over the period of Federal control, the total amounts allocable to the years of Federal control are as follows:

| | |
|---|---|
| 1918 _____ | $113,109.84 |
| 1919 _____ | 113,109.84 |
| 1920 _____ | 18,580.70 |

Each of the above mentioned companies' claims included a claim for adjustment of compensation in an amount equal to that allocated to "Back mail pay" by the Director General. The basis of the claim for the allowance of such an adjustment, as set out in the claims, was the same in all cases, except for the amounts involved, and is as follows:

Claim for adjustment of its standard return to meet proportion of additional revenue to which it is entitled and which should be credited in the test period to cover this company's proportion of increased mail pay awarded for the period Nobvember 1, 1916 to June 30, 1917, on basis of $ ——————, giving an amount to be added to the revenue during the test period of $ ——————, one-third of which would be $ ——————.

(D–4) Paragraph 21 of the stipulation is as follows:

21. ADDITIONS AND BETTERMENTS, SECTION 8 CLAIMS—$2,299,777.40: The respondent concedes that he erroneously included in taxable income for the years 1921 and 1922 the amounts of $2,064,461.18 and $235,316.22, respectively, described as additions and betterments, Section 8 Claims, and that the petitioner's taxable net income for said years may be reduced by said respective amounts.

(D–5) Paragraph 22 of the stipulation is as follows:

22. INTEREST ON NEW ORLEANS TERMINAL BONDS—$280,000.00: The respondent has determined that the amount allowed to Southern Railway Company by the Director General of Railroads in the final settlement with that company as interest on New Orleans Terminal Company bonds is $280,000, and the respondent has included this amount in petitioner's taxable income in the year 1921, being the year said settlement was effected.

Nothing herein shall be construed to mean that the petitioner concedes that the foregoing amount was allowed or paid to petitioner by the Director General, as determined by respondent, or that the allocation of the Director General, and the determination of respondent, was or is binding on petitioner, or that it is precluded from proving the contrary.

During Federal control, the Southern Railway Company, by reason of its guarantee of the interest on bonds of the New Orleans Terminal Company, was required to pay semiannually the sum of $280,000 to the holders of those bonds. Five due dates of such interest fell within the Federal control period: January 1, and July 1, 1918; January 1 and July 1, 1919; and January 1, 1920. Provision for the January 1, 1918, semiannual interest payment was made by the Southern Railway Company before coming under Federal control. The Director General advanced $280,000 to the Southern Railway on each of the four last interest due dates in the Federal control period, out of which advances it paid the interest. In its claim against the Director General, the Southern Railway Company charged itself and gave the Director General credit for the full amount of these advances; it has never made any claim against the Director General for any allowance with reference to interest on New Orleans Terminal Company bonds.

(A) The first problem confronting us in connection with the decision of the several questions involved in this issue, is the matter of the allocation of the lump sum settlements of claims filed with the Director General by the several companies for amounts alleged

to be due them as the result of the Federal control of their properties. A proper determination of the petitioner's tax liability requires that such an allocation be made to determine what amounts involved in the final settlements are taxable and what are nontaxable, and the year or years to which the taxable amounts belong. The respondent, relying entirely upon the Director General's allocation, determined that the settlements included allowances to the companies of $4,836,764.58 for additional compensation over and above the aggregate standard returns certified by the Interstate Commerce Commission, $244,800.38 adjustment of compensation for " back mail pay ", $280,000 for interest on New Orleans Terminal Company bonds, $559,734.33 for profit on relay rail sold during Federal control, and $1,539,987.26 for materials and supplies, amounting in all to $7,461,286.55. The petitioner, while conceding that in the final settlements the companies received, by a process of offsetting debit and credit items in the claims, an allowance in the amount of $7,461,286.55, in addition to the lump sum cash settlements, contends that the allowance was made for " reparation of capital " or undermaintenance of properties during Federal control, making a total allowance of $19,427,485.90 for undermaintenance. (Note the stipulation that the Director General allowed not less than $11,966,199.35 for undermaintenance; and petitioner adds to that figure the sum of $7,461,286.55, making a total of $19,427,485.90.) It is contended further that the Director General's *ex parte* allocation is arbitrary and not warranted by the facts; that such allocation, made without the knowledge of, and not disclosed to, nor accepted by, petitioner, is not binding upon it; and that the petitioner, as creditor, has the right at will to apply or allocate the payments or credits received in the final settlements, in the absence of an application or allocation thereof by the Director General, as debtor, and that such allocation must be recognized as fact by the respondent.

We have heretofore said that the Director General's books are not competent as evidence of any facts or agreements that were consummated by the final settlements between Federal controlled carriers and the Director General. *Terminal Railroad Assn. of St. Louis*, 17 B. T. A. 1135, and *Missouri Pacific R. R. Co.*, 22 B. T. A. 267. That the respondent, in his determination, relied entirely upon the Director General's books, is, however, of no consequence in these proceedings. We are not concerned as to how the respondent reached his determination; for though the method may be entirely wrong, the determination still may be correct. *Uncasville Mfg. Co.*, 19 B. T. A. 920. The statute attaches to that determination the presumption of prima facie correctness, which can only be overcome by

substantive evidence. In *New York, Chicago & St. Louis R. R. Co.*, 26 B. T. A. 1229, the contention was advanced " that since there was but a lump sum settlement made after full discussion of many items, petitioner has the right to break down the ultimate figure according to its own choice, and that such allocation must be recognized as fact by the Commissioner," and in disposing of the contention, we said:

That the petitioner has the right to choose its own accounting in this respect, within the scope of the Interstate Commerce Commission's supervision, can not be gainsaid by the Commissioner or by the Board; but it is equally clear that no accounting adopted by the petitioner has a sanction greater than the Commissioner's duty to determine its taxable income in accordance with effective revenue law. What a carrier may do in its accounting classification as a private industry or even as a regulated interstate carrier is apart from its subservience as a taxpayer to the requirements of the revenue law. *Old Colony R. R. Co.* v. *Commissioner*, 284 U. S. 552. Therefore in this proceeding the significance of the amount in question is not determinable by reference to the views of the petitioner's own officers as to a convenient or satisfactory accounting for the item or their interpretation of the settlement or its component factors, nor with reference to the conversations with the Railroad Administration during the course of the negotiation as to the extent of the controversy. The last were swallowed up in the final lump sum settlement, and the former are important only in so far as they are supported by substantive evidence.

Even if it could be conceded that the Director General's and the respondent's allocations of the final settlements are wrong, and that the petitioner and its Federal controlled affiliates did not receive any allowances for the disputed items, there is nothing in the record which would justify the allocation of the $7,461,286.55 as an additional allowance for undermaintenance. There is no evidence that the undermaintenance suffered by the properties of the Federal controlled companies was greater, in terms of dollars and cents, than $11,966,199.35, the amount which the parties have stipulated is the least the Director General allowed for undermaintenance. Substantive evidence is lacking, therefore, to support the petitioner's allocation of the sum in question to undermaintenance. No inference may be safely drawn from a comparison of the petitioner's and the Director General's allocations, which show them to be in apparent accord upon all other items contained therein; for the claims, aggregating over $52,000,000, contain innumerable items which do not appear in either allocation, and we know nothing about the merits of those items. We may not assume that none of these last mentioned items were included in the final settlement. It is evident, therefore, that we can not accept the petitioner's allocation of the $7,461,286.55 to undermaintenance.

While there is some evidence sufficient to create a substantial doubt as to the entire accuracy of the respondent's allocation of the $7,461,-268.55 allowance, we can not correct the situation, since we are wholly

without substantive evidence upon which to base any conclusion as to what would constitute a proper allocation. Confessedly, the allowance was received by the companies in the final settlements with the Director General; and the respondent determined that the whole of it must be reflected, in one form or another, in the computation of taxable net income. Under the circumstances, it was not enough for the petitioner to prove that the respondent's allocation is wrong; it was duty bound to prove what is right, but in that respect it failed. So, even though the allowance may not have been made in respect of the specific items alleged by the respondent, it is evident that we can not disturb his determination that the allowance itself must be reflected in its entirety in the computation of the taxable net income.

(B) This question has been designated by the parties as undermaintenance. Petitioner urges that the respondent has erroneously disallowed $11,966,199.35 of the total deductions for maintenance of way, structures, and equipment during the last 10 months of 1920, a period immediately following the period of Federal control. This amount is part of the petitioner's actual expenditure for the period accounted for as maintenance, but the disallowance is based on the respondent's determination that to this extent the petitioner's ostensible maintenance cost was really not its own, but a burden assumed by the Director General. The question is wholly within the field of deductions. The exact question of fact is, therefore, whether or not the petitioner and its affiliates charged to operating expenses, or maintenance, in the last 10 months of 1920 any expenditures made to overcome the undermaintenance of their properties during Federal control, for which they were later reimbursed by the Director General. The facts of undermaintenance of the properties during Federal control and of the Director General's allowance of $11,966,199.35 in final settlements, to compensate the companies for such undermaintenance, are established by the stipulation.

We have already said that the maintenance expenditures during the last 10 months of 1920 were not greater, in fact were less, than the equated and adjusted expenditures for maintenance of an average ten months of the test period; and that notwithstanding these expenditures the properties were not in as good condition at the end of 1920 as on March 1 of that year when they were returned by the Director General. These facts, the petitioner contends, bring its case squarely within the decisions of this Board in *Missouri Pacific R. R. Co.*, 22 B. T. A. 267; *Norfolk Southern R. R. Co.*, 22 B. T. A. 302; *Kansas City Southern Ry. Co.*, 22 B. T. A. 949; and *Chicago & North Western Ry. Co.*, 22 B. T. A. 1407. In all of the cited cases the Board considered, as controlling, the comparative expenditures for maintenance as between the last 10 months of 1920 and prior

periods, in its analysis of the proof to determine whether or not undermaintenance of the Federal control period was overcome, or whether the carriers' maintenance expenditures in the 1920 period included expenditures to rehabilitate the property which might not be deducted from gross income. Thus, in *Kansas City Southern Ry. Co., supra*, and *Chicago & North Western Ry. Co., supra*, we applied the accounting test and found that those carriers had overcome the undermaintenance of Federal contral in 1920 to the extent only that on a properly equated comparative basis their maintenance expenditures in the last 10 months of 1920 exceed the normal expenditures for an average ten months of the test period, and in *Missouri Pacific R. R. Co., supra*, and *Norfolk Southern R. R. Co., supra*, we similarly applied the accounting test and found that those carriers, on a properly equated comparative basis, failed to any extent in the last 10 months of 1920 to make expenditures for maintenance exceeding the normal maintenance expenditures, in the one case as compared to a period of 10 years prior to Federal control, in the other case, as compared to an average 10 months of the test period. Blindly applying the accounting test in the case at bar, the inevitable conclusion would be that the undermaintenance of the Federal control period was not made good or overcome by the expenditures for maintenance during the last 10 months of 1920.

There are in the instant case, however, certain other material facts which can not be lightly brushed aside; and it is these facts which distinguish it from the cited cases, other than the *Missouri Pacific* case, of which we shall have more to say later. In the cited cases there were no findings by the Board comparable to the stipulation of the parties here, that:

Petitioner concedes that during the last 10 months of the year 1920 it repaired many of the worst conditions of undermaintenance in its way, structures, and equipment existing when its properties were returned, and that it charged the cost of such repairs to operating expenses and deducted same from taxable income.

This stipulation makes it evident that any blind and slavish adherence to the accounting test in this case would lead to a conclusion contrary to actual fact.

It may well be conceded upon the evidence that whatever was done in the last 10 months of 1920 to make good or overcome the undermaintenance of the Federal control period was at the expense of less pressing items of current maintenance; and because of this situation the petitioner, relying upon our decision in the *Missouri Pacific* case, contends that the accounting test should govern our conclusions. In the case referred to, the finding was made that "No part of the undermaintenance of the Federal control period was made good

during the period from March 1 to December 31, 1920", and in the course of our opinion we stated as follows:

The proof upon this issue is very lengthy and we do not propose to discuss it in detail. The petitioner produced as witnesses the men whose duty it was to oversee the maintenance of the properties, men who were thoroughly familiar with the petitioner's properties at the time they were taken over, at the time returned, and during all of 1920. Their testimony was in substance that the average condition of maintenance of the properties at the close of 1920 was no better than on March 1, 1920. In detail they explained what was done and why more was not done. Counsel for the Commissioner points out that their testimony discloses that many of the worst conditions existing when the roads were returned were corrected as soon as possible. While this was done, the testimony is that it was at the expense of less pressing items of current maintenance. Amounts available for maintenance were expended where most needed. Primary lines were improved while the secondary lines suffered still further undermaintenance. It is quite evident that the question can not be solved merely by looking at particular items of maintenance or undermaintenance. The real question is whether the average condition of maintenance was improved during 1920. The testimony of these witnesses was supported by detailed statistical studies which disclosed that after adjusting the purchasing power of the dollar in terms of labor and materials and giving effect to the increase in traffic, the amount expended for maintenance in 1920 was practically the same as the average amount expended for the period 1910 to 1920 and was less than the average amount expended in the years designated in the Federal Control Act as the test period * * *. It is upon the testimony of those in charge of maintenance work during the taxable years, based upon their personal knowledge of the property and its physical condition, supported by the other evidence mentioned above, that we reach our conclusion that no part of the expenditures made during 1920 is to be accounted for as made to overcome undermaintenance of the Federal control period.

We thereupon reversed the Commissioner's action in refusing to allow the deduction of the full amount expended for maintenance in 1920. Except for the finding of fact already quoted, the two cases are, in all other essential respects, analogous; and if our conclusion in the cited case was sound, a like conclusion must be reached here.

From our knowledge of the entire question of undermaintenance, broadened now by the experience gained in the consideration of later cases, we do not hesitate to say that our decision on the matter of undermaintenance in the case of *Missouri Pacific R. R. Co., supra,* was erroneous. The accounting test, conceived originally in the Federal control standard contracts between the Director General and the controlled carriers as a means by which to measure the standard of maintenance performed by the Director General during Federal control, and later adopted as a means for testing the normality of carriers' maintenance expenditures in the guaranty period in determining the amount to be paid by the Government under the guaranty provisions of section 209 of the Transportation Act, 1920, is simply a statistical comparison in which the labor and material units used

in maintenance work of the last 10 months of 1920 are compared with like units so used in an accepted normal period, usually the test period, the units of both periods being expressed in dollars and cents properly equated on a comparative basis, to determine whether the amount of maintenance accomplished in the first mentioned period is greater or less than normal; and, if proper equation factors have been used to reflect the difference in the purchasing power of the dollar, and the amount and use of the properties maintained, as between the two periods, the test well fulfills its purpose. Alone, it will not reveal whether maintenance accomplished in the 1920 period was current maintenance, with the cost falling upon the carrier, or maintenance which belonged to, and which the Director General should have performed in, the Federal control period, and for which the carrier was later reimbursed by the Director General; and the fact that the maintenance expenditures of the 1920 period were no greater than the average of an accepted normal period does not prove that the expenditures were for current maintenance or that they were borne by the carrier. The instant case is a fitting illustration of the point; the maintenance expenditures of the 1920 period were less than the average of the test period, but the parties have stipulated that some part of the undermaintenance of the Federal control period was made good or overcome in the 1920 period, and, for all that the record shows, the petitioner and its affiliates were fully compensated for every condition of undermaintenance of the Federal control period. These facts clearly indicate that the accounting test can not be relied upon as a means for determining whether or not undermaintenance of the Federal control period was made good in the 1920 period.

The fact that there was no improvement in the average condition of maintenance by the expenditures of the 1920 period is of no importance; that, like the accounting test, indicates only that not more than the usual and normal amount of maintenance was accomplished in the period, or that such maintenance as was performed was not greater than current necessity required. The real question here is, Was the maintenance performed in the 1920 period, or some portion thereof, that which actually belonged to the Federal control period for which the petitioner was reimbursed by the Director General?; and that can not be answered by a mere comparison of maintenance conditions at the beginning of the period with the conditions existing at the end of the period, as was held in the *Missouri Pacific* case, but requires an examination of particular items of maintenance performed. Concededly, in another case, the requirement might burden the taxpayer with a difficult, and perhaps a well-nigh impossible, task, since it is by no means an easy matter to

establish by direct, primary evidence of knowledge and observation that particular items of maintenance of the 1920 period are not those which actually belong to the Federal control period; but "The impossibility of proving a material fact upon which the right to relief depends, simply leaves the claimant upon whom the burden rests with an unenforceable claim, a misfortune to be borne by him, as it must be borne in other cases, as the result of a failure of proof." *Burnet* v. *Houston*, 283 U. S. 223. Here, however, the parties themselves have made the examination and, as a result thereof, have stipulated that some part of the undermaintenance of the Federal control period was made good in the 1920 period; and with that stipulation the question might well have been decided adversely to the petitioner without further discussion, were it not for the erroneous conclusions of the *Missouri Pacific* case upon which the petitioner relies.

The effect of the *Missouri Pacific* decision is to say that, whenever it can be shown by a statistical demonstration that not more than a normal amount of maintenance was performed in 1920, it will be presumed that such as was performed was current maintenance of the 1920 period and not in any respect that which properly should have applied in the Federal control period. The facts of this case clearly demonstrate, as indeed did the evidence in the *Missouri Pacific* case, that the presumption is entirely unjustified and when indulged will frequently lead to conclusions contrary to actual fact. Moreover, the presumption creates administrative difficulties, is inconsistent with the annual determination of income, and would defeat the statutory prohibition against the deduction of expenses, losses, or depreciation which are not actually borne by the taxpayer. It is precisely what was urged upon us in *New York, Chicago & St. Louis R. R. Co.*, *supra*, and we had this to say about it:

Petitioner proceeds as if the compensation for undermaintenance were a rehabilitation fund impinging upon the computation of its taxable net income only if and when it is actually used to restore or replace the property which suffered by the undermaintenance, and that this can, as to any year, be disproved by a statistical demonstration, including equated comparisons of labor and material, that the expenditure for maintenance is no more than an assumed normal current outlay.

Leaving aside for the moment the practical difficulties in such a view,—difficulties no less than those encountered by the Director General and the Interstate Commerce Commission in the settlement under the Federal control contract and under the guaranty provision of section 209 of the Transportation Act,—it is at least doubtful whether the revenue act is to be so construed as to contemplate the annual recurrence of such an issue until a year may be found in which the statistical studies yield a resulting figure of maintenance above an adopted form. It is also more than doubtful that, regardless of administrative difficulties in ascertaining the facts, the theory is consistent with the annual determination of income.

At the close of 1920 the petitioner's properties were still in an undermaintained condition, because the amount of maintenance performed in the 1920 period was not sufficient both to take care of the current maintenance requirements of that period and to overcome the undermaintenance of the Federal control period. If in some later year, for instance 1933, the petitioner sees fit to accelerate and make current the maintenance of its properties, could its right to deduct the entire maintenance expenditures of the year be successfully challenged on the ground that they exceed a statistical norm? No such test of deductibility is laid down in the statute; on the contrary, such expenditures being one of a carrier's ordinary and necessary expenses, the statute provides that they shall be deducted in the year in which paid or incurred. Or, could the deduction be challenged on the ground that it included expenditures to make good or overcome the undermaintenance of the Federal control period? Certainly not, if it be a fact that Federal control undermaintenance was actually made good in the 1920 period. Consequently, if the reasoning of the *Missouri Pacific* decision is adopted here, the petitioner will be permitted to deduct all expenditures incurred in overcoming Federal control undermaintenance and in maintaining its properties according to its usual standard; and, the cost to make good the Federal control undermaintenance having been borne by the Director General and not the petitioner, the statutory inhibition against the deduction thereof will be avoided.

The decision on the matter of undermaintenance in the *Missouri Pacific* case will not be followed in the future.

We repeat that there is no proof that the Director General did not fully compensate the petitioner for every condition of undermaintenance suffered by its properties during Federal control. The presumption is, therefore, that the Director General bore whatever expense was incurred in the 1920 period in making good such undermaintenance. While it appears that not all of such undermaintenance was made good in the 1920 period, the petitioner offered no proof that it expended less for that purpose than what the respondent determined. The decision on this question must favor the respondent.

(C) The two items under consideration here are a part of the Director General's allowance of $7,461,286.55 mentioned in the discussion of the question of the allocation of the final settlements in (A). Alternatively to its claim that the amounts involved here were allowed for undermaintenance, petitioner claims (1) that the respondent's disallowance of $1,539,987.26 of its operating expenses for 1920 is erroneous, because certain items included in the inventory of material and supplies received back from the Director General at a

total value of $234,152.94 were not charged to operating expenses in that year; and (2) that the respondent has erroneously disallowed $559,734.33 of its operating expenses for 1920, because any allowance by the Director General for profit on rail sold during Federal control would constitute income and not such an allowance as would in anywise affect the operating expenses of that year.

As to the item of $1,539,987.26, the respondent's determination is partly in error. The entire inventory of materials and supplies received back from the Director General was not charged to operating expenses in 1920; a portion of the inventory was used in additions and betterments work and was charged to capital accounts, while other items, included in the inventory at a total value of $234,152.94, were still on hand and not used at the close of the year, and had not been charged to operating expenses in 1920. As to the items used in additions and betterments work, there is no evidence as to the value at which they were included in the inventory turned back by the Director General; consequently, we can not determine what adjustment should be made in the respondent's determination in respect of them. As to the items on hand at the end of the year, we think it fair to assign to them such proportion of the excess value as bears the same ratio to $1,539,987.26 as their inventory value of $234,152.94 bears to the total inventory value of $12,766,849.26. Accordingly, net income of the Southern Railway Company for 1920 as determined in the deficiency notice should be reduced by $28,244.29.

The petitioner's contention in respect of the item of $559,734.33 is wholly untenable. It is simply a challenge of the method by which the respondent reaches an admittedly correct result. Whether the item be treated as an item of gross income or as an offset against operating expenses, the resulting net income would be the same, and no change results in the respondent's deficiency determination. So far as this item is concerned, the respondent's determination will not be disturbed.

(D-1, D-2, D-3) The four items involved are also a part of the Director General's allowance of $7,461,286.55 mentioned in the discussion of the question of the allocation of the final settlements in (A). Alternatively to its claim that the amounts involved here were allowed for undermaintenance, the petitioner contends that these items of additional compensation for the use of its properties during Federal control constituted income of the accounting periods for which said compensation was allowed, and not of the years in which the final settlements were made as determined by the respondent. The petitioner's contention is in accord with the prior decisions of this Board in *Old Dominion Steamship Co.*, 16 B. T. A. 264; affd., 47

Fed. (2d) 148; and *Kansas City Southern Ry. Co.*, 16 B. T. A. 665; affd., 52 Fed. (2d) 372; and, accordingly, it is entitled to a favorable decision on these items. The parties have stipulated the amounts to be included in income in the event of such a decision as we have made here, and full effect will be given thereto in the recomputation under Rule 50.

(D–4) In view of the stipulation of the parties as to this item, net income for 1921 and 1922, as determined by the respondent in the deficiency notices, should be reduced by the respective amounts of $2,064,461.18 and $235,316.22.

(D–5) The decision under (A) is applicable to this item; and, accordingly, the respondent's determination in the matter is approved.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*

Murdock and Goodrich dissent.

Lansdon, dissenting: I am unable to agree with that part of this report which sustains disallowance by the respondent of the amount of $11,966,199.35 as a deduction from the income of the petitioner in the taxable period as ordinary and necessary expenses and which overrules our opinion in the *Missouri Pacific R. R. Co.*, 22 B. T. A. 267.

In its income tax return for the taxable period the petitioner claimed a deduction from income on account of maintenance in the amount of $55,556,415.21. Upon audit the respondent disallowed this claim to the extent of $11,966,199.35, which is the exact amount that was credited to the petitioner by the Director General in final settlement as undermaintenance. This disallowance was based on the theory that to the extent thereof maintenance in the period involved was paid for by the United States. There is no controversy over the facts. The parties agree that the amount claimed was spent by the petitioner for maintenance in the taxable period and that the part disallowed is the amount of credit for undermaintenance accumulated during the period of Government control.

In railroad accounting all expenditures for maintenance are chargeable to expense regardless of the time when the physical condition of the property called for the repairs. This is good accounting and is required by the Interstate Commerce Commission. It is perfectly obvious that no going railroad can ever be in perfect condition at the beginning of any accounting period. It is impossible to break down any aggregate disbursement for maintenance into amounts that were paid for repairs and noncapital replacements

needed at the beginning of a period and those representing similar expenditures, the occasion for which originated within the period. Except in cases such as the proceeding now at bar, this is recognized by the taxing authorities and amounts proved to represent maintenance are uniformly allowed as deductions from income. It would seem, therefore, that the agreement of the parties that the entire amount claimed by the petitioner was paid for maintenance during the taxable period is sufficient to shift the burden of proof to the respondent.

The facts found in this proceeding prove undermaintenance of the petitioner's properties in the taxable year as compared with the test period in the amount of approximately $1,300,000 and that they were in a worse condition at the close than at the beginning of such year. Here the statistical method and the evidence adduced by the records and oral testimony are in agreement. The petitioner spent less money than was necessary to maintain its properties in the taxable period and its claim for deduction represents only the amounts actually expended.

The basis for our conclusion in *Missouri Pacific R. R. Co., supra,* is that a railroad is entitled to deduct maintenance from its income in any year or period in an amount at least equal to the average expenditure for the so-called test period, properly equated to conform to conditions in the period in controversy. In that report we held that it is immaterial that some of the payments were for maintenance postponed from a prior year if it is shown that current needs were postponed for that purpose. This conclusion harmonizes with the nature of maintenance and of accounting therefor as set out above. Relying on this rule, the petitioner stipulated that during the taxable period it repaired many of the worst conditions of undermaintenance in its ways and structures and equipment existing when the properties were returned, and that it charged the cost of such repairs to operating expenses and deducted the same from taxable income.

The effect of the majority opinion is to hold that the petitioner stipulated itself out of court because what was so spent was paid for by the Director General in the credit for undermaintenance and that without proof of the amounts thereof it must be held that the whole credit was so used. I can not agree with that conclusion. In the first place the petitioner used only its own money in payments for maintenance during the taxable period. By the very terms of the standard contract the credit for undermaintenance was made to restore the petitioner's capital structure impaired during the period of Federal control. Whether paid in cash or by credit the

amount allowed went into the capital of the petitioner at the date of the final settlement between the Director General and the railroads. It was not an earmarked fund and was available thereafter for any proper corporate purpose. It was in the nature of a capital transaction. *Terminal R. R. Assn. of St. Louis*, 17 B. T. A. 1135.

If the payment for undermaintenance was a capital transaction, it follows then that it has no bearing on the issue here in controversy. The only proper basis upon which any part of the expenditure of $55,556,415.21 can be disallowed is that some part of it represents capital outlay rather than operating expense. The respondent makes no such contention. He does not dispute that the whole sum was paid for maintenance in the taxable year, but contends that a part of it was paid by the Director General. In the face of the fact, now well settled, that the whole credit for undermaintenance was a capital transaction, this contention, in my opinion, is without merit. This Board has held in several proceedings that if the amounts paid out for maintenance in the ten-month period under review are no more than normal as compared with the test period, deductibility is established.

The majority report questions the soundness of the statistical method for determining normal maintenance during the period under review. A sufficient answer to such criticism it seems to me is the fact that the standard contract prescribes exactly this method for determining the amount of undermaintenance during the period of Federal control and that the payment to the petitioner for that purpose was so computed. Congress also prescribed the same method for determining the amounts due railroads under the guaranty provisions of section 209 of the Railway Act of 1920. These seem to me to be ample precedents for so determining normal maintenance for the period from March 1 to December 31, 1920. The Government recognized that actual proof of the physical condition of the railroads at the beginning and end of the period of Federal control would be impossible, since it would require the survey and valuation of each of the multitude of items included in the physical structure of a railroad. Possibly it may have had in mind the long continued and extraodinarily expensive effort of the Interstate Commerce Commission to determine by actual survey the capital value of the railroads of this country, a job that has already cost many millions of dollars and that is still uncompleted. There are situations where practicability must prevail over mathematical exactitude and this is especially true in taxation. If railroads, in controversies like this, are to be required to prove the exact physical condition of all elements of their properties at the beginning and end of a taxable period, a burden is imposed that none can carry and the determinations of

the Commissioner are given the force and effect not of presumption, but of law. On the record I believe that the issue relating to undermaintenance here involved should be decided in favor of the petitioner, in conformity with *Missouri Pacific R. R. Co., supra; Norfolk Southern R. R. Co.*, 22 B. T. A. 302; *Kansas City Southern Ry. Co.*, 22 B. T. A. 949; and *Chicago & North Western Ry. Co.*, 22 B. T. A. 1407.

SMITH, dissenting: The taxing statute permits the deduction of " all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." Section 234 (a) (1) of the Revenue Act of 1918. The amount spent by the petitioner in 1920 for maintenance was a legal deduction from gross income, even though such maintenance expenses may in part have served to overcome undermaintenance during the period of Federal control. In *Kansas City Southern Ry. Co.*, 22 B. T. A. 949, .966–971, are set forth additional reasons why, in my opinion, the deduction should not be disallowed.

LEECH did not participate in the consideration of or decision in this proceeding.